**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2011-NMSC-001**

**Filing Date:  December 8, 2010**

**Docket No. 31,442**

**STATE OF NEW MEXICO**,

>       **Plaintiff-Appellee,**

**v.**

**MICHAEL WILSON**,

>       **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**John A. Dean, Jr., District Judge**

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Gary K. King, Attorney General
Andrea Sassa, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**BOSSON, Justice.**

**{1}** Defendant Michael Wilson was convicted by a jury in the suffocation death of a two-year-old foster child living in Defendant's Farmington home.  Defendant appeals his conviction of one count of first-degree abuse of a child resulting in death either knowingly, intentionally, or negligently caused, contrary to NMSA 1978, Section 30-6-1(D), (H) (1973) (amended 2005).  We have jurisdiction to hear his direct appeal under Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA.  We affirm the verdict, and find:  (1) the *corpus delicti* of the crime was sufficiently established at trial, (2) the trial

1

court did not abuse its discretion in allowing a forensic pathologist to testify as to the cause of death, (3) admission of Defendant's confession did not violate the Fifth or Fourteenth Amendments to the United States Constitution, and (4) there was no cumulative error.

**BACKGROUND**

**{2}**     On January 24, 2007, Defendant called 911 to report that his foster son Tyler was not breathing. The 911 operator instructed Defendant how to perform CPR, but Tyler regained consciousness and began to breathe without assistance.

**{3}**     The next day, Defendant took Tyler to a previously scheduled appointment with Dr. Gerard Holmes, a pediatric cardiologist. Tyler had been born with patent ductus arteriosus, a heart condition which commonly affects premature infants. Tyler had successful surgery to treat this condition shortly after his birth. Dr. Holmes had been consulted to determine whether Tyler's previous heart surgery might impact an unrelated ear surgery. During the examination, Defendant mentioned that Tyler had been in the emergency room the previous night because he had stopped breathing. Dr. Holmes examined Tyler's lungs, but could not find any respiratory abnormalities. Dr. Holmes also examined Tyler's cardiovascular health, and after finding no signs of patent ductus arteriosus, determined that Tyler's heart was in excellent shape. Dr. Holmes concluded that "everything looked normal."

**{4}**     One day after Tyler was evaluated by Dr. Holmes, Defendant again called 911, claiming Tyler was not breathing. The 911 operator walked Defendant through CPR techniques, at which point Defendant unsuccessfully attempted to resuscitate Tyler. Officers from the Farmington Police Department quickly arrived on the scene and Tyler was transferred by ambulance to the San Juan Regional Medical Center. Emergency room medical personnel tried to resuscitate Tyler but were unsuccessful, and he was eventually pronounced dead approximately thirty minutes after arrival.

**{5}**     On February 2, 2007, Defendant and his wife were separately interviewed by Detective Frank Dart of the Farmington Police Department. They were interviewed for a second time on February 7, 2007, again by Detective Dart. During the course of the second interview with police, Defendant admitted to killing Tyler. Defendant explained that, after tucking Tyler into bed, he pulled Tyler's blanket over his face holding it there for thirty seconds to one minute, knowing it might prevent Tyler from breathing. Defendant also explained how, because Tyler often slept on his back with his head turned to one side, he had pushed on Tyler's pillow for "leverage" while holding the blanket over his face. Defendant told Detective Dart that once Tyler stopped moving, he got up from the bed and proceeded to walk around the house for around five minutes "picking things up." Defendant then returned to the bedroom where he noticed that Tyler's lips were blue, at which point Defendant called 911.

**{6}**     When asked why he had suffocated Tyler, Defendant initially told Detective Dart that he did not mean to kill Tyler, and that he planned on reviving Tyler to make himself look

2

like a hero. At another point in the interview, Defendant stated that he did intend to kill Tyler, but only to end his suffering, because Tyler was always sick. Using a doll and a blanket, Defendant demonstrated on videotape how he had killed Tyler. At the suggestion of Detective Dart, Defendant produced a handwritten apology letter to Tyler's biological family, along with a separate confession letter which memorialized his previous admissions.

**{7}** After deliberating for approximately one hour, the jury returned a guilty verdict on one count of first-degree child abuse resulting in death. Defendant was sentenced to a term of life imprisonment plus a term of four years as a habitual offender with two prior felony convictions. *See* NMSA 1978, § 31-18-17(B) (2003).

## DISCUSSION

### The *Corpus Delicti* Rule

**{8}** "The term 'corpus delicti,' which literally means 'body of the crime,' refers to the evidence needed to establish that the charged crime was actually committed." *State v. Weisser*, 2007-NMCA-015, ¶ 10, 141 N.M. 93, 150 P.3d 1043. "[T]he existence of the corpus delicti is demonstrated by the fact that a harm or injury occurred and that the harm or injury was caused by a criminal act." *Id.* "'In homicide cases the corpus delicti is established upon proof of the death of the person charged in the information or indictment, and that the death was caused by the criminal act or agency of another.'" *State v. Sosa*, 2000-NMSC-036, ¶ 15, 129 N.M. 767, 14 P.3d 32 (quoting *State v. Armstrong*, 61 N.M. 258, 259, 298 P.2d 941, 941 (1956)).

**{9}** In a thorough opinion written by Judge Pickard, our Court of Appeals has analyzed the evolution of the *corpus delicti* rule, tracing its origin from the seventeenth and eighteenth centuries in England through its modern application in New Mexico. *See generally Weisser*, 2007-NMCA-015, ¶¶ 10-25. The *corpus delicti* rule, which initially applied only to homicides until American courts expanded its reach, *see id.* ¶ 13, was meant "'to prevent the conviction of those who confessed to non-existent crimes as a result of coercion or mental illness,'" *id.* ¶ 14 (quoting David A. Moran, *In Defense of the Corpus Delicti Rule*, 64 Ohio St. L.J. 817, 817 (2003)). The advent of the rule "was influenced somewhat by those widely reported cases in which the 'victim' returned alive after his supposed murderer had been tried and convicted, and in some instances executed." *City of Bremerton v. Corbett*, 723 P.2d 1135, 1139 (Wash. 1986) (en banc); *see Weisser*, 2007-NMCA-015, ¶ 13.

**{10}** In its traditional form, the *corpus delicti* rule required the prosecution to introduce evidence of a criminal act separate and apart from an accused's extrajudicial confession. *See Weisser*, 2007-NMCA-015, ¶ 12 ("If the state can present sufficient independent evidence, apart from a defendant's confession, to establish the corpus delicti, the defendant's confession may then be used to sustain a conviction."). A number of legal commentators and courts have expressed concern that the *corpus delicti* rule was "turn[ing] into [a] doctrinal obstacle[] whereby the guilty can escape just punishment." *Conn. v. Harris*, 575

3

A.2d 223, 227 (Conn. 1990); *see also Ohio v. Black*, 376 N.E.2d 948, 951 (Ohio 1978) ("Considering the revolution in criminal law of the 1960's and the vast number of procedural safeguards protecting the due-process rights of criminal defendants, the corpus delicti rule is supported by few practical or social-policy considerations." (internal quotation marks and citation omitted)); *Wash. v. Ray*, 926 P.2d 904, 909 (Wash. 1996) (Talmadge, J., concurring) ("The rule of corpus delicti has been severely criticized by renowned legal commentators, numerous law review articles and case law."). In response to such critiques, "the corpus delicti rule [in its traditional form was] abandoned in the federal courts and in a number of state courts." *Weisser*, 2007-NMCA-015, ¶ 15. Most notably, the United States Supreme Court rejected the traditional *corpus delicti* rule in favor of a doctrine that focuses on the "trustworthiness" of a defendant's extrajudicial confession. *See Opper v. United States*, 348 U.S. 84, 93 (1954); *Smith v. United States*, 348 U.S. 147, 156 (1954).

**{11}**    The lynchpin of the federal trustworthiness doctrine is the requirement that a defendant's extrajudicial confession be sufficiently corroborated. *See United States v. Shunk*, 881 F.2d 917, 919 (10th Cir. 1989) ("As it presently exists, the corpus delicti concept has been properly characterized as a 'version' of the corroboration requirement for the introduction of extrajudicial statements."). As *Weisser* explains,

> [u]nder the trustworthiness doctrine, "corroborative evidence need not be sufficient, independent of the [defendant's] statements, to establish the corpus delicti." *Opper*, 348 U.S. at 93 . . . . Instead, "[i]t is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth." *Id.* Further, "'[t]here is no necessity that [the] proof [independent of the defendant's confession] touch the *corpus delicti* at all.'" [*State v. Parker*, 337 S.E.2d 487, 492 (N.C. 1985)] (alteration in original) (quoting *Opper*, 348 U.S. at 92 . . .). Rather, "proof of any corroborating circumstances is adequate which goes to fortify the truth of the confession or tends to prove facts embraced in the confession." *Opper*, 348 U.S. at 92 . . .; *see also United States v. Johnson*, 589 F.2d 716, 718-19 (D.C. Cir. 1978) (stating that under the trustworthiness doctrine, "the adequacy of corroborating proof is measured not by its tendency to establish the corpus delicti but by the extent to which it supports the trustworthiness of the [defendant's] admissions").

*Weisser*, 2007-NMCA-015, ¶ 15. The federal trustworthiness doctrine differs from the traditional *corpus delicti* rule in that it "'emphasizes the reliability of the defendant's confession over the independent evidence of the corpus delicti.'" Eugene R. Milhizer, *Confessions After* Conley*: An Evidentiary Solution for Excluding Unreliable Confessions*, 81 Temp. L. Rev. 1, 45 (2008) (quoting *Virgin Islands v. Harris*, 938 F.2d 401, 409 (3d Cir. 1991)).

**{12}**    The federal approach has not been met with universal acceptance. A number of states have found the trustworthiness framework so nebulous and "malleable that almost any

4

independent evidence of anything can serve to corroborate the confession or make it trustworthy." *Weisser*, 2007-NMCA-015, ¶ 16 (internal quotation marks and citation omitted). These "states have not adopted the trustworthiness doctrine in its entirety, but rather have simply modified their treatment of the corpus delicti rule in light of the federal trustworthiness doctrine." *Id.* (internal quotation marks and citation omitted).

**{13}** As Judge Pickard explains, New Mexico has embraced modern reforms to the *corpus delicti* rule, although the reception of these changes in our caselaw has not been altogether clear. For example, in *State v. Paris*, 76 N.M. 291, 295, 414 P.2d 512, 515 (1966), we "announced that [New Mexico] had adopted the trustworthiness doctrine and rejected the corpus delicti rule." *Weisser*, 2007-NMCA-015, ¶ 17. However, *Paris*, 76 N.M. at 296, 414 P.2d at 515, cited with approval a New Jersey case which set forth a modified trustworthiness rule. *See Weisser*, 2007-NMCA-015, ¶ 17 ("[N]o greater burden should be required of the State than independent corroborative proof tending to establish that when the defendant confessed he was telling the truth, *plus* independent proof of the loss or injury." (internal quotation marks and citation omitted)).

**{14}** Shortly after *Paris* issued, we seemingly reverted back to the traditional *corpus delicti* rule. *See State v. Nance*, 77 N.M. 39, 44-45, 419 P.2d 242, 246 (1966) ("When there is, in addition to a confession, proof of the corpus delicti established by independent evidence, the defendant's voluntary confession will support a conviction."). At other times, we have vacillated between a federal trustworthiness rule and a modified trustworthiness rule. *Compare State v. Sanchez,* 109 N.M. 718, 719, 790 P.2d 515, 516 (Ct. App. 1990) ( "[I]f independent evidence is introduced that tends to establish the trustworthiness of the extrajudicial confession, a conviction will be sustained.") *with State v. Buchanan*, 76 N.M. 141, 143, 412 P.2d 565, 566-67 (1966) ("[A] statement, when established as trustworthy, may properly be considered together with independent or corroborative evidence as proof that the crime charged was committed." (citation omitted)).

**{15}** *Weisser* clarifies the current state of our law, and we now adopt its reasoning: New Mexico applies a modified trustworthiness rule as announced in *Paris*. *See Weisser*, 2007-NMCA-015, ¶ 24. Under New Mexico's modern approach, a defendant's extrajudicial statements may be used to establish the *corpus delicti* when the prosecution is able to demonstrate the trustworthiness of the confession *and* introduce some independent evidence of a criminal act. *See id.* ¶ 18.

**{16}** We note that our adoption of *Weisser* is not in conflict with *Sosa*, 2000-NMSC-036, this Court's last discussion of the *corpus delicti* issue. *Sosa* was a first-degree murder case where the victim was shot several times in the face while standing on his front porch. 2000-NMSC-036, ¶¶ 1-2. At trial the defendant raised a *corpus delicti* challenge, arguing that there was no independent evidence that *he shot the victim,* other than an extrajudicial confession given to his sister. *Id.* ¶ 16. We rejected the defendant's challenge as a misapplication of the *corpus delicti* rule, since it was undisputed that the victim was killed by the criminal agency of another. *Id.* ¶¶ 15-16, 20. We noted that in New Mexico "the

corpus delicti of an offense is established by proof that the crime was committed, and the identity of the perpetrator is not material." *Id.* ¶ 20 (citing *Nance*, 77 N.M. at 44, 419 P.2d at 246). We reaffirm that statement in *Sosa*. Nothing in *Sosa* was intended to be "a repudiation of the *Paris* rule," *Weisser*, 2007-NMCA-015, ¶ 23, or the modified trustworthiness approach we adopt herein.

**Applying the *Corpus Delicti* Rule to this Case**

**{17}** Because Defendant contends that the undisputed facts do not establish the *corpus delicti* of the crime as a matter of law, our standard of review is de novo. *See Weisser*, 2007-NMCA-015, ¶ 7. To the extent Defendant's *corpus delicti* challenge "rests on disputed facts, we will defer to the district court's findings of fact, provided that such findings are supported by substantial evidence." *Id.*

**{18}** Defendant argues that the State failed to establish the *corpus delicti* of homicide because his confession "was the only indicator that a crime had actually taken place." According to Defendant, the death of a two-year-old child without signs of trauma is equally consistent with natural causes as it is with homicide, and given the lack of physical evidence, the only evidence supporting death by a criminal act was his confession. Defendant's argument would have us ignore much of the record. The evidence at trial sufficiently corroborates the trustworthiness of the confession and, more importantly, the trial record contains some evidence, independent of the confession, that Tyler died from a criminal act.

**{19}** The trial court's written order denying Defendant's motion for a directed verdict based on the *corpus delicti* rule made certain factual findings. These include: (1) the trial testimony confirmed Defendant's statement that he was alone with Tyler at the time of the death; (2) Defendant's statements regarding the sequence of events were confirmed by telephone records and trial testimony; (3) the responding officers found Tyler on the bedroom floor, which was consistent with Defendant's admission that he had moved Tyler from the bed to the floor after suffocating him; (4) the blankets and pillows found on the bed were consistent with Defendant's stated method of killing; (5) the lack of observable trauma on Tyler's nose and mouth area corresponds to Defendant's claim that he smothered Tyler using a soft instrument; (6) the responding officer saw that Tyler was blue and not breathing, confirming Defendant's statement that Tyler's lips were purple and he was not breathing after being suffocated; (7) Defendant recounted the CPR instructions to Detective Dart, and the recording of the 911 call revealed Defendant had given Detective Dart a very accurate rendition of the operator's instructions; and (8) Defendant's statements regarding a white substance seeping from Tyler's nose was confirmed by the officer's observations.

**{20}** We initially note that the trial court's findings by themselves might not sufficiently establish the *corpus delicti* of the crime of homicide under New Mexico's modified trustworthiness approach. The findings confirm the trustworthiness of Defendant's statement to Detective Dart, but only to a limited degree. Our inquiry does not end with the trial court's factual findings, however. This Court performs its own review of the record and

supplements the trial court's findings as needed. *See Weisser*, 2007-NMCA-015, ¶ 28 ("'[A]n appellate court will affirm the district court if it is right for any reason and if affirmance is not unfair to the appellant.'" (quoting *Maralex Res., Inc. v. Gilbreath*, 2003-NMSC-023, ¶ 13, 134 N.M. 308, 76 P.3d 626)). A review of the complete record confirms the trustworthiness of Defendant's confession while also independently supporting the existence of a homicide.

**{21}**    One piece of corroborative evidence is the testimony of Dr. Holmes, who characterized Tyler as being in normal respiratory and cardiovascular health just one day prior to his death. Dr. Holmes' testimony confirms Defendant's statement that Tyler was not critically ill and that Defendant caused Tyler's death. Dr. Holmes' testimony also constitutes some independent evidence of a crime. His pediatric examination of Tyler's lungs and heart, given shortly before Tyler's death, failed to reveal any abnormalities, suggesting that Tyler was killed by an external force and not natural causes. The only external force supported by the record is that of homicide by suffocation.

**{22}**    The State also introduced the testimony of Dr. Brad Campbell, an emergency room physician, who treated Tyler at the San Juan Regional Medical Center on the night of his death. Dr. Campbell reviewed x-rays of Tyler's chest and observed pulmonary vascular congestion and swelling in Tyler's lungs. Dr. Campbell associated the swelling and congestion with evidence that Tyler had not been breathing for thirty minutes prior to the x-ray, and not necessarily with any underlying medical condition that was capable of killing Tyler. The testimony of Dr. Campbell also tends to support Defendant's admission that Tyler did not die from an illness, but instead was suffocated.

**{23}**    Also in the record are Defendant's misleading statements to law enforcement and to the Office of the Medical Investigator (OMI) concerning Tyler's medical history. On the night of Tyler's death, Officer Fuller of the Farmington Police Department responded to Defendant's 911 call. While at Defendant's home, Defendant told Officer Fuller that Tyler had been taken to the emergency room two days earlier, where he was diagnosed with respiratory syncytial virus. Defendant later admitted, during the February 7, 2007 interview with police, that Tyler was never diagnosed with respiratory syncytial virus, and that his prior statements were false.

**{24}**    The State also introduced the testimony of Amy Woods, a pathologist assistant with OMI. Ms. Woods visited the San Juan Regional Medical Center on the night of Tyler's death to gather his medical information. Defendant spoke with Ms. Woods, telling her that Tyler had been born with a heart disease called coarctation and was scheduled to have heart surgery in a week. When pressed on the subject, Defendant told Ms. Woods that he did not know where the surgery would be performed or the name of the surgeon. During his February 7, 2007 interview with the police, Defendant admitted that he had lied to Ms. Woods, that Tyler did not have a current heart problem, and that Tyler was not scheduled for upcoming heart surgery.

7

**{25}** None of the medical providers who appeared at trial, including the forensic pathologist, testified to the presence of coarctation, respiratory syncytial virus, or the need for heart surgery. The medical testimony therefore corroborates Defendant's admission that he lied to state authorities. Defendant's misrepresentations also constitute some independent evidence of a homicide. Defendant's unusual claims about Tyler's health, in the aftermath of his death, suggest that Defendant was acting with a consciousness of guilt and that he had painted Tyler as chronically sick in order to cover up a crime.

**{26}** Other evidence in the record further supports the trustworthiness of Defendant's confession. As an example, Defendant did not begin performing CPR on Tyler until after receiving instructions from the 911 operator, even though relevant CPR techniques had been explained to him just two days earlier. Such evidence confirms Defendant's admission that, after suffocating Tyler, he performed household chores for approximately five minutes before calling 911. Also, Dr. Kurt Nolte, a forensic pathologist who supervised Tyler's autopsy, testified that Tyler's cause of death was consistent with a blockage to his mouth and nose which, in turn, caused the organs in Tyler's body to fail for a lack of oxygen. Dr. Nolte stated that the autopsy report revealed an absence of physical marks around the mouth and nose and a general lack of physical trauma. In Dr. Nolte's opinion, the absence of such markings was consistent with the suffocation of a two-year-old child by a much larger adult using a soft instrumentality, such as a blanket and pillow. The absence of physical findings in the autopsy report parallels Defendant's claimed method of killing.

**{27}** It is worth comparing the *corpus delicti* evidence in this case to what was offered by the state in *Weisser*. The defendant, on trial for criminal sexual contact of a minor, told his girlfriend and others that a diagnosis of Huntington's disease was God's punishment for molesting his two-year-old daughter. *Weisser*, 2007-NMCA-015, ¶ 2. Yet, the only evidence corroborating the trustworthiness of these extrajudicial statements was that the defendant had actually been diagnosed with Huntington's disease. *Id.* ¶¶ 2-5, 31. In addition, the only independent evidence supporting the existence of a crime was that the victim had exhibited two out of twelve "behaviors that could be corroborative of sexual abuse listed on the S.A.N.E. [sexual assault nurse examination] form," specifically "nightmares and withdrawal from strangers, particularly male strangers." *Id.* ¶¶ 33-34, 36. Even the trial court in *Weisser* characterized the *corpus delicti* evidence as "tenuous." *Id.* ¶ 32.

**{28}** By contrast, here the *corpus delicti* of homicide is well supported by the record. The trial court's factual findings support certain essential facts of Defendant's February 7, 2007 statements to law enforcement. After considering the trial court's findings along with the broader evidentiary record, we conclude that Defendant's confession was sufficiently trustworthy. Independent evidence also shows Tyler's death was caused by a criminal act. We refer to Dr. Holmes' timely examination, Dr. Campbell's emergency room observations, Dr. Nolte's expert opinion, and Defendant's unusual statements about Tyler's medical history. For the reasons highlighted above, we reject Defendant's *corpus delicti* challenge.

8

**The Admission of Expert Opinion**

{29}     Defendant filed a pretrial motion to prevent Dr. Nolte from testifying that the cause of Tyler's death was consistent with smothering.  Defendant did not object to Dr. Nolte's qualifications to offer expert testimony.  In fact, Defendant indicated that he wanted Dr. Nolte to testify, only that his testimony should be limited to the autopsy report itself which contained "no definitive autopsy findings for smothering."  After hearing argument, the trial court denied Defendant's motion.

{30}     Defendant has renewed the same argument on appeal.  Defendant contends that the trial court violated Rule 11-702 NMRA by permitting Dr. Nolte to testify that the cause of Tyler's death was consistent with smothering.  Defendant argues that Dr. Nolte's opinion was unreliable because it was based on his review of the police report and the confession rather than medical science.

{31}     "The admission of expert testimony or other scientific evidence is peculiarly within the sound discretion of the trial court and will not be reversed absent a showing of abuse of that discretion."  *State v. Alberico*, 116 N.M. 156, 169, 861 P.2d 192, 205 (1993).  Under Rule 11-702 NMRA, expert opinion testimony is admissible upon the following conditions: "(1) experts must be qualified; (2) their testimony must assist the trier of fact; and (3) their testimony must be limited to the area of scientific, technical, or other specialized knowledge in which they are qualified."  *State v. Torres*, 1999-NMSC-10, ¶ 23, 127 N.M. 20, 976 P.2d 20.  In addition, "[f]ollowing the lead of the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), this Court has established that it is error to admit expert testimony involving scientific knowledge unless the party offering such testimony first establishes the evidentiary reliability of the scientific knowledge."  *Id.* ¶ 24.

{32}     Defendant argues that his case is analogous to cases from New York and Tennessee, both of which concerned expert testimony about the death of an infant by suffocation.  *See People v. Eberle*, 265 A.D.2d 881 (N.Y. App. Div. 1999); *State v. Ward*, 138 S.W.3d 245 (Tenn. Crim. App. 2003).

{33}     In *Eberle*, the state's expert witness testified that there were "no medical findings to explain the death," and the autopsy report "equally supported two possible causes of death, i.e., suffocation and Sudden Infant Death Syndrome (SIDS)."  265 A.D.2d at 881.  The expert nonetheless concluded that the infant's death was caused by "homicidal suffocation," based on her review of the defendant's statement and the statements of other individuals.  *Id.*  On appeal, the court disallowed the expert's testimony, holding that "the opinion of the People's expert was not based on professional or medical knowledge but rather was based on inferences and conclusions drawn from various statements presented to her by the police."  *Id.* at 882. The court noted that it was up to "the jury [as opposed to the expert] to determine whether to credit such statements and to determine the inferences to be drawn therefrom."  *Id.*  The Court also held the term "'homicidal' suffocation improperly states a

conclusion regarding defendant's intent . . . [and] intrude[s] on the province of the jury . . . ." *Id.*

**{34}** In *Ward*, the forensic pathologist testified that the infant died from asphyxiation and the "manner of death was homicide." *Ward*, 138 S.W.3d at 254. To reach that conclusion, the expert applied the so-called "rule of three," which is more analogous to an inference of probability providing that when three infants in one home die from deaths otherwise attributable to SIDS, the cause of death is more likely homicide than natural causes. *Id.* at 257. On appeal, the court excluded the use of the expert's opinion, reasoning that the "rule of three" did not constitute a proper basis for expert testimony and was not trustworthy. *Id.* at 258, 271.

**{35}** We find neither *Eberle* nor *Ward* persuasive authority. Defendant has failed to show that the sudden and unexplained deaths of two infants in *Eberle* and *Ward* are relevant to the case before us. After all, Tyler was two years old when he died, and the possibility of a SIDS-type death was never raised at trial. It is also unclear whether such a theory would be medically viable in light of Tyler's advanced age.

**{36}** *Eberle* is also a rather truncated opinion, and the New York intermediate appellate court provided little factual background or reasoning to support its holding. Furthermore, the ruling in *Eberle* concerns not only the expert's reliance on statements beyond the medical record, but also the expert's improper characterization of the infant's death as a homicide. 265 A.D.2d at 882. Dr. Nolte never characterized Tyler's death as a homicide. While Dr. Nolte concluded that Tyler's death was consistent with "smothering," he defined smothering in physiological terms as a blockage of the external breathing openings, specifically the nose and mouth. Dr. Nolte did not state whether his use of the word smothering indicated a homicide, a suicide, or an accident. More significantly, Defendant never objected to Dr. Nolte's use of the word smothering as stating a legal conclusion. *See State v. Clifford*, 117 N.M. 508, 513, 873 P.2d 254, 259 (1994) ("[O]pinion testimony that seeks to state a legal conclusion is inadmissible."). Unlike the expert in *Eberle*, Dr. Nolte's ultimate opinion was based on more than just the confession and police report. Dr. Nolte testified that he considered several sources of information when forming his opinion, including the medical record and the autopsy report, as well as Defendant's confession and the police report.

**{37}** Defendant's reference to the *Ward* case is also unhelpful. Dr. Nolte never relied on wholly speculative science like the "rule of three." The validity of Dr. Nolte's underlying method was not reasonably in dispute, unlike that of the expert in *Ward*. Moreover, Defendant does not cite any caselaw standing for the principle that a forensic pathologist may not consider evidence beyond the medical record, such as a confession or police report, to help inform his medical opinion. *See Head v. Lithonia Corp.*, 881 F.2d 941, 943 (10th Cir. 1989) ("What is necessary is that the expert arrived at his . . . opinion by relying upon *methods* that other experts in his field would reasonably rely upon in forming their own, possibly different opinions, about what caused the patient's disease." (internal quotation marks and citation omitted)); *Porter v. Whitehall Labs., Inc.*, 791 F. Supp. 1335, 1343 (S.D.

10

Ind. 1992) ("An expert may rely *only* on evidence on which a reasonable expert in the field would rely.").

**{38}** The trial court adequately performed its gatekeeper function when it determined that Dr. Nolte's opinion was relevant, reliable, and helpful to the jury. *State v. Downey*, 2008-NMSC-061, ¶ 25, 145 N.M. 232, 195 P.3d 1244 ("Our inquiry is . . . to determine the role of the trial judge as gatekeeper, which has been described as ensuring that any and all scientific testimony or evidence admitted is not only relevant, but reliable." (internal quotation marks and citation omitted)). Defendant was free to persuade the jury that Dr. Nolte's opinion relied too much on a questionable confession and not enough on hard science. The jury remained the ultimate arbiter of Dr. Nolte's credibility, and it was free to reject his opinion and conclude that Tyler's death was caused by natural causes. "Given the capabilities of jurors and the liberal thrust of the rules of evidence, we believe any doubt regarding the admissibility of scientific evidence should be resolved in favor of admission, rather than exclusion.*" Lee v. Martinez*, 2004-NMSC-027, ¶ 16, 136 N.M. 166, 96 P.3d 291.

**Harmless Error**

**{39}** Even if we were to assume that the trial court improperly admitted Dr. Nolte's opinion testimony, the error would be harmless. Harmless error for a non-constitutional violation occurs when "there is no reasonable *probability* the error affected the verdict." *State v. Barr*, 2009-NMSC-024, ¶ 53, 146 N.M. 301, 210 P.3d 198. Reviewing courts consider three factors when determining whether an error is harmless. The factors are whether there is: (1) substantial evidence to support the conviction without reference to the improperly admitted evidence; (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear minuscule; and (3) no substantial conflicting evidence to discredit the State's testimony. *Id.* ¶ 56 (footnote omitted). "No one factor is determinative; rather, they are considered in conjunction with one another." *Id.* ¶ 55.

**{40}** Absent Dr. Nolte's opinion that Tyler's cause of death was consistent with smothering, substantial evidence supports Defendant's conviction for first-degree child abuse resulting in death. Defendant's confession was extremely detailed. He explained the series of events leading up to Tyler's death and supplied Detective Dart with a motive for the killing. His confession was captured on video, relevant portions of which were played for the jury. Defendant even reenacted the killing using a blanket and doll, which was similarly recorded on video and played for the jury. The jury saw Defendant's handwritten apology letter to Tyler's biological family, along with another handwritten letter in which Defendant described how he suffocated Tyler. The record further contains the testimony of Dr. Holmes, who examined Tyler and declared him perfectly healthy one day before Tyler died. Lastly, the prosecution presented evidence of Defendant's aberrant behavior in the days following Tyler's death. Even disregarding Dr. Nolte's testimony, the evidence against Defendant was overwhelming. Dr. Nolte's "smothering" conclusion merely lent some small

support to the great weight of evidence Defendant had already provided against himself.

**{41}** We also note that Dr. Nolte did not try to hide the potential shortcomings of his testimony. Dr. Nolte conceded before the jury that his cause of death determination would have been different had his review of the record been limited to the autopsy report. Absent his consideration of the confession and police report, Dr. Nolte acknowledged that he might have attributed Tyler's death to pneumonia or left it undetermined. To the extent Dr. Nolte appeared to leave open the possibility of death by natural causes, we think the jury was unlikely to give the "smothering" portion of his testimony disproportionate weight.

**{42}** In addition, Defendant did not present substantial evidence to discredit the State's case of homicide. Other than the small portion of Dr. Nolte's testimony which supported the possibility of pneumonia, not much else controverts the prosecution's case in chief. Little in the record expounds upon the seriousness of the pneumonia, and whether it would have been sufficiently virulent to have killed Tyler. In fact, Dr. Holmes in his direct testimony characterized pneumonia as "a very common problem in childhood." Cutting further against a theory of deadly pneumonia is that the doctors who personally examined Tyler did not find any evidence of a potentially fatal underlying respiratory illness. We are satisfied, as a matter of legal probability, that Dr. Nolte's testimony as to the cause of death, even if erroneous, did not affect the jury's verdict.

**Admissibility of Defendant's Confession**

**{43}** Defendant contends the trial court should have suppressed his February 7, 2007 statements to law enforcement, because they were taken in violation of the Fifth and Fourteenth Amendments to the United States Constitution. *See* U.S. Const. amends. V and XIV, § 1.

**{44}** Defendant and his wife were first interviewed by Detective Dart at the Farmington Police Department on February 2, 2007. Defendant's wife worked at the Department, and Detective Dart recognized Defendant from various department social functions and from regular visits Defendant made to the police station to see his wife. Detective Dart interviewed Defendant's wife first. During the course of the interview, Detective Dart was told by an administrative assistant that Defendant was "having trouble" in the police department lobby. Detective Dart and Defendant's wife immediately returned to the lobby where they found Defendant slouched back in a chair shaking. Defendant's wife approached Defendant and spoke to him. Detective Dart asked whether Defendant needed medical attention, to which his wife responded that Defendant would be fine in a few minutes. Within several minutes, Defendant indeed appeared to have recovered, and Detective Dart and Defendant's wife left the lobby and resumed their interview.

**{45}** After completing the interview with Defendant's wife, Detective Dart conducted a two-hour interview with Defendant. Among the topics addressed were Tyler's medical history, including the medications he had been prescribed, and the events surrounding the

12

first call Defendant placed to 911 on January 24, 2007.

**{46}** Three days after his first interview, on February 5, 2007, Defendant admitted himself into the Behavioral Health Unit at the San Juan Regional Medical Center, reporting depressive and suicidal thoughts. Defendant voluntarily spent the night at the hospital, checking himself out the next day. While there Defendant was diagnosed with bipolar II disorder, post-traumatic stress disorder, conversion disorder, and a panic disorder. Defendant was prescribed Seraquel, an antipsychotic drug used to treat depression. Among Seraquel's possible side effects are confusion, diminished motor skills, and impaired judgment.

**{47}** Defendant and his wife scheduled a second interview for February 7, 2007. Shortly before the interview, Defendant called Detective Dart and left a voice message asking if they could meet sometime earlier in the day, although Defendant indicated he could still make the prearranged time if necessary. The interview took place as scheduled. This time Defendant agreed to be interviewed first. Defendant was escorted by Detective Dart to an "interviewing room," which had video recording capabilities. No other individuals were present. Before commencing the interview, Detective Dart advised Defendant that he was not under arrest and he was under no obligation to speak. Defendant was also advised that he was free to stop the interview at any point and leave. Defendant reiterated that he wanted to make a statement. It was during the February 7, 2007 interview that Defendant confessed to killing Tyler, reenacted the killing with a doll and blanket, and produced the two handwritten letters. The entire interview lasted between two and three hours.

**{48}** Under our caselaw, "[a]n officer's obligation to administer *Miranda* warnings arises only 'when a person is (1) interrogated while (2) in custody.'" *State v. Vasquez*, 2010-NMCA-041, ¶ 26, 148 N.M. 202, 232 P.3d 438 (quoting *State v. Wilson*, 2007-NMCA-111, ¶ 12, 142 N.M. 737, 169 P.3d 1184). Defendant's position is that his February 7, 2007 statements to law enforcement triggered *Miranda* warnings because he was in custody at the time.

> "Custody is determined objectively, not from the subjective perception of any of the members to the interview." *State v. Nieto*, 2000-NMSC-031, ¶ 20, 129 N.M. 688, 12 P.3d 442. A court therefore applies an objective test to resolve whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Wilson*, 2007-NMCA-111, ¶ 14 . . . . Because the test is objective, the inquiry is how a reasonable person who is being interviewed by police would have understood his or her situation. *Id.* This Court has identified a number of factors to consider in determining whether a reasonable person would believe he or she is free to leave "includ[ing] the purpose, place, and length of interrogation[,] . . . the extent to which the defendant is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention, and the degree of pressure applied to the defendant." [*State v.*] *Bravo*, 2006-

13

NMCA-019, ¶ 9, 139 N.M. 93, 128 P.3d 1070 (internal quotation marks and citation omitted).

*Vasquez*, 2010-NMCA-041, ¶ 27.

**{49}**     The evidence in the record does not support a finding that Defendant's freedom of movement was restrained.   The February 7, 2007 interview was the second time that Defendant had met with Detective Dart within a week, and the second interview was, at most, only one hour longer than the initial interview.   On both occasions Defendant was accompanied by his wife, and on both occasions they drove to the police station in their own vehicle.   Defendant was told explicitly that he was not under arrest, he was free to leave at any point, and that he was under no obligation to speak with law enforcement.   Defendant responded to this warning by telling Detective Dart that he wanted to make a statement.   Defendant was also familiar with police personnel through his wife, and he even called Detective Dart to discuss rescheduling the interview.   The record supports the trial court's finding that the police encounter was non-coercive and unintimidating, and that a reasonable person in Defendant's position would have believed the interview could have been terminated at any point.   We affirm the trial court's ruling that the February 7, 2007 interview did not implicate *Miranda*.

**{50}**     With regard to Defendant's claim that his confession was involuntary and violated due process, we review this claim de novo.  *State v. Evans*, 2009-NMSC-027, ¶ 32, 146 N.M. 319, 210 P.3d 216.  "If a defendant's will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *State v. Munoz*, 1998-NMSC-048, ¶ 20, 126 N.M. 535, 972 P.2d 847 (internal quotation marks and citations omitted).  Under the totality of the circumstances analysis, "the prosecution bears the burden of proving by a preponderance of the evidence that a defendant's statement was voluntary."   *Evans*, 2009-NMSC-027, ¶ 34; *Munoz*, 1998-NMSC-048, ¶ 23.   "[T]he preponderance of the evidence must establish that the confession was not 'extracted from an accused through fear, coercion, hope of reward, or other improper inducements.'" *State v. Cooper*, 1997-NMSC-058, ¶ 30, 124 N.M. 277, 949 P.2d 660 (quoting *State v. Turnbow*, 67 N.M. 241, 253-54, 354 P.2d 533, 542 (1960)).

**{51}**     The voluntariness of a confession depends upon the existence of "official coercion," and we have held that a defendant's mental state by itself cannot render a confession involuntary. *Munoz*, 1998-NMSC-048, ¶ 21; *State v. Fekete*, 120 N.M. 290, 299, 901 P.2d 708, 717 (1995) ("[U]nder the totality of circumstances test, a confession is not involuntary solely because of a defendant's mental state.   Instead, the totality of circumstances test includes an element of police overreaching.").  "Case law makes clear that when interrogators are unaware of, and therefore cannot exploit, the mental or emotional vulnerabilities of a suspect, the crucial link between the confession and official action is missing." *Evans*, 2009-NMSC-027, ¶ 38.

**{52}**     While Detective Dart testified to a general awareness that Defendant had been

14

admitted to the Behavioral Health Unit shortly before February 7, 2007, there is no evidence in the record that Defendant's confession was anything other than "'the product of an essentially free and unconstrained choice.'" *Munoz*, 1998-NMSC-048, ¶ 21 (quoting *Culombe v. Conn.*, 367 U.S. 568, 602 (1961)). Despite the incident that occurred in the lobby of the Farmington Police Department on February 2, 2007, Defendant was able to quickly recover and conduct an otherwise unremarkable two hour interview. Indeed, Detective Dart noted that no one who witnessed the episode, including Defendant's wife, was concerned enough to request medical help. Moreover, the inculpatory interview did not occur until five days later.

**{53}** Regarding the February 7, 2007 statements, Detective Dart testified that Defendant's responses were coherent and intelligent. The handwritten letters Defendant produced at the conclusion of the interview were described by Detective Dart as exhibiting "very good penmanship" and clarity. Detective Dart testified that Defendant's statements and writings did not appear to be the product of an individual who was under the influence of narcotics, based on his experience dealing with such individuals. Moreover, the trial court found that there was no proof Defendant had actually taken the medication he had been prescribed.

**{54}** Even though Defendant had been diagnosed with significant psychological problems, the medical records otherwise indicate Defendant's mental state was improving when he self-discharged from the Behavioral Health Unit on February 6, 2007. At the time of discharge, Defendant was described by his treating psychiatrist as "insightful into the nature of his problems." His psychiatrist also indicated that Defendant was not exhibiting any side effects from medication, and that he had requested to be "discharged in light of the fact that he was feeling better." Defendant even conveyed a sense of excitement at the prospects of a job interview he had arranged for February 7, 2007, the same day he confessed to suffocating Tyler.

**{55}** We accordingly reject Defendant's claims under the Fifth and Fourteenth Amendments to the United States Constitution.

**Cumulative Error**

**{56}** Because we reject Defendant's arguments and find no error, the cumulative error doctrine does not apply. *See State v. Salas*, 2010-NMSC-028, ¶ 40, 148 N.M. 313, 236 P.3d 32.

**CONCLUSION**

**{57}** For the reasons stated herein, we affirm Defendant's conviction finding that (1) the *corpus delicti* of the crime was sufficiently established at trial, (2) the trial court did not abuse its discretion in allowing a forensic pathologist to testify as to the cause of death, (3) admission of Defendant's confession did not violate the Fifth or Fourteenth Amendments to the United States Constitution, and (4) there was no cumulative error.

**{58}    IT IS SO ORDERED**.

                                _____

                                **RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PATRICIO M. SERNA, Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

**Topic Index for *State v. Wilson*, Docket No. 31, 442**

| | |
|---|---|
| **CT** | **CONSTITUTIONAL LAW** |
| CT-MW | Miranda Warnings |
| CT-CF | Confession |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CN | Child Abuse and Neglect |
| CL-CF | Capital Felony |
| CL-HO | Homicide |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-CC | Corpus Delicti Rule |
| CA-EX | Expert Witness |
| CA-MW | Miranda Warnings |
| CA-CF | Confession |
| | |
| **EV** | **EVIDENCE** |
| EV-EW | Expert Witness |
| EV-SC | Scientific Evidence & Daubert |