This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                    NO. 33,419

**ROBERT GEORGE TUFTS,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Marci Beyer, District Judge**

Hector H. Balderas, Attorney General
M. Anne Kelly, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**SUTIN, Judge.**

{1}    Defendant Robert George Tufts was convicted of criminal sexual communication with a child, contrary to NMSA 1978, Section 30-37-3.3 (2007). We initially heard this case and issued an opinion reversing Defendant's conviction on the ground that the statute under which Defendant was prosecuted did not apply to his conduct. *State v. Tufts (Tufts I)*, 2015-NMCA-075, ¶¶ 1, 12-18, 355 P.3d 32 (concluding that Section 30-37-3.3 did not prohibit Defendant's conduct because he did not "send" the images to Child when he transferred images via a secure digital (SD) card and hand-delivered the card to Child). That opinion was reversed by the Supreme Court in *State v. Tufts (Tufts II)*, 2016-NMSC-020, ¶¶ 8-10, ___ P.3d ___ (rejecting the New Mexico Court of Appeals' interpretation of the term "send" and concluding that "confin[ing] the definition of 'sending' to encompass only electronic transmissions . . . would frustrate the purpose of the legislation"). The case was remanded to this Court for further consideration of the remaining issues on appeal. *Id.* ¶ 10. In his remaining issues on appeal, Defendant asserts: (1) because he was in custody but had not been given warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), the district court erred when it refused to suppress Defendant's statements made to police detectives; and (2) the jury was instructed with a patently erroneous definition of "obscene" resulting in fundamental error.

**{2}** We affirm the district court's denial of Defendant's motion to suppress because we conclude that Defendant was not subject to a custodial interrogation when he was interviewed by police detectives, and therefore the detectives were not required to notify Defendant of his *Miranda* rights. We also conclude that the instruction provided to the jury regarding the definition of "obscene" did not result in fundamental error.

**BACKGROUND**

**{3}** Much of the relevant factual background regarding the relationship between Defendant and Child, as well as the procedural history of Defendant's case, is detailed in *Tufts I*, 2015-NMCA-075, ¶¶ 2-7. Additional facts regarding the remaining issues on appeal are set forth as needed in this Opinion.

**{4}** After conducting a forensic interview of Child, Las Cruces Police Department Detective Rudy Sanchez asked Defendant to come to the police station for questioning. Defendant agreed, and on March 16, 2012, he voluntarily arrived at the police station for an interview. Upon arriving, Defendant was escorted to a secure area of the station, and Detective Sanchez and his partner, Detective Michael Garcia, began to interview Defendant. At the beginning of the interview, Defendant was told that he was not under arrest and that he was free to leave at any time. He was informed that the door to the interview room would remain closed during the interview but that it

was only closed to provide privacy. Defendant was informed that he did not need to tell the detectives anything or answer any of their questions.

{5} During the course of the interview, Defendant denied being concerned about going to jail. When asked about Defendant's last communication with Child, Defendant indicated that he had texted with her two days prior, he had not communicated with her since then, and he presumed the detectives had confiscated her phone because he had not heard from her. Detective Sanchez reminded Defendant that deleted files could be retrieved from the phone and asked for consent to search Defendant's phone. Defendant agreed to the search. Detective Sanchez then disclosed to Defendant that he had in fact spoken to Child and that they had possession of Child's phone but that they needed Defendant's consent to search the phone because he had paid for the phone. Defendant appears to have hesitated somewhat but then agreed to having Child's phone searched by the detectives. Detective Sanchez then asked Defendant what was going to be on the phone, to which Defendant responded "that's where the . . . problem's gonna be." He then admitted to sending pictures of his nude penis and one or more sexual videos of himself. He also admitted that he knew sending the pictures was wrong because he "looked it up." He also explained to the detectives his process of transferring the video to Child's phone by switching the SD cards between phones. The detectives then presented Defendant with a consent

authorization form to search both phones and asked Defendant to review and sign it. Defendant hesitated, indicating that his phone was the primary way of contacting his children. He then began to cry, and the detectives reminded Defendant that he was going to walk out of the interview at its conclusion, to which Defendant stated, "that's not my concern." Instead, Defendant stated that his concern was not being able to communicate with Child and "losing her."

{6}     Approximately forty-seven minutes after beginning the interview and immediately after expressing his concern about losing contact with Child, Defendant began to have a seizure. The detectives requested medical assistance, and after the seizure subsided, Defendant explained that he has had seizures since he was a child and that they are triggered by stress. Once emergency personnel arrived, a medic asked Defendant what triggered the episode, to which Defendant replied, "just being really stressed," and Detective Sanchez opined, "the conversations we were having" caused the stress. Defendant was evaluated but declined further medical treatment. He reported that his last seizure was the previous night.

{7}     After the medics left, Detective Sanchez asked if Defendant was confused or disoriented, to which Defendant responded that he understood where he was, who he was speaking with, and the allegations discussed. Detective Sanchez explained that he wanted to make sure that Defendant recalled giving consent to search the phones.

Defendant asked what would happen if he did not remember giving consent, to which the detectives responded that they would take custody of the phones and obtain a search warrant. Defendant expressed concern that not consenting would "make[] things more difficult" and would look bad. The detectives explained that it would not necessarily make things more difficult and that it was Defendant's right to tell the detectives no. The detectives assured Defendant that refusing consent did not "look bad" and again reminded him that he had every right to tell them no. The detectives then indicated that Defendant should leave because it seemed like the environment was "triggering something." Defendant ultimately confirmed consent but stated that he was "just worried." All in all, the interview continued for approximately eight minutes after Defendant was evaluated by medical personnel, and the interview concluded approximately one hour and seven minutes after it began.

{8} Defendant filed a motion to suppress the statements he made to the detectives during his interview. The district court held a hearing on the motion to suppress Defendant's statements made during the custodial interrogation without *Miranda* warnings. After hearing testimony from Detective Sanchez and argument from counsel, the district court denied the motion. In its order, the district court found that the following facts, when considered in totality, supported the conclusion that Defendant was not in custody for *Miranda* purposes: (1) Defendant agreed to give a

6

statement and voluntarily drove to the police station for the purpose of giving that statement; (2) Defendant was not under arrest and was not placed in handcuffs; (3) at the beginning of the interview, the detectives told Defendant that he was not under arrest and that the interview was non-custodial; (4) the detectives told Defendant that the door to the interview room was closed only for privacy and that he could leave at any time; (5) the detectives told Defendant that he did not have to answer their questions or tell them anything; (6) Defendant acknowledged the detectives' statements regarding Defendant's freedom; (7) the degree of pressure applied to Defendant was minimal; and (8) the interview lasted for just over one hour.

**DISCUSSION**

**Custodial Interrogation**

{9} Defendant argues that the district court erred when it failed to suppress his statements made during police questioning because the interview took place during a custodial interrogation and he was not informed of his *Miranda* rights. He argues that the interrogation was custodial because, under the totality of the circumstances, a reasonable person in his position would have felt "inherently compelling pressure" to cooperate. Specifically, Defendant argues that he was not free to leave because (1) the interrogation was lengthy and distressing, (2) the physical surroundings of the interrogations created a confined and police-dominated environment, and (3) the

7

purpose of the interrogation was to acquire a confession and consent to search both phones, which was achieved by confronting Defendant with evidence against him.

{10} "The standard of review for a suppression ruling is whether the trial court correctly applied the law to the facts when the facts are viewed in the light most favorable to the prevailing party. Under this standard, the trial court's factual determinations are subject to a substantial evidence standard of review, and its application of the law to the facts is subject to de novo review." *State v. Snell*, 2007-NMCA-113, ¶ 7, 142 N.M. 452, 166 P.3d 1106 (citation omitted). "Determining whether or not a police interview constitutes a custodial interrogation requires the application of law to the facts" and is therefore reviewed de novo. *Id.* (internal quotation marks and citation omitted).

{11} According to *Miranda*, 384 U.S. at 444, a police officer must advise an individual during custodial interrogation that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." "[A]n officer's obligation to administer *Miranda* warnings arises only when a person is (1) interrogated while (2) in custody." *State v. Wilson*, 2011-NMSC-001, ¶ 48, 149 N.M. 273, 248 P.3d 315 (internal quotation marks and citation omitted), *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, 275 P.3d 110. "[*Miranda* warnings] are not required

8

for non-custodial interrogations." *Snell*, 2007-NMCA-113, ¶ 10. In determining whether an individual is in custody, we apply an objective test "not from the subjective perception of any of the members to the interview." *State v. Nieto*, 2000-NMSC-031, ¶ 20, 129 N.M. 688, 12 P.3d 442. We consider "how a reasonable person who is being interviewed by police would have understood his . . . situation." *Wilson*, 2011-NMSC-001, ¶ 48 (internal quotation marks and citation omitted). This objective test is used "to resolve whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (internal quotation marks and citation omitted); *see Nieto*, 2000-NMSC-031, ¶ 20. Stated differently, an individual is considered to be in custody "if a reasonable person would believe that he . . . [was] not free to leave the scene." *State v. Munoz*, 1998-NMSC-048, ¶ 40, 126 N.M. 535, 972 P.2d 847.

{12}   This Court considers "a number of factors . . . in determining whether a reasonable person would believe he . . . is free to leave, including the purpose, place, and length of interrogation, . . . the extent to which the defendant is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention, and the degree of pressure applied to the defendant." *Wilson*, 2011-NMSC-001, ¶ 48 (third omission in original) (alterations, internal quotation marks, and citation omitted).

**{13}** Here, there does not appear to be any dispute that Defendant was interrogated. We therefore focus on whether Defendant was in custody. In this case, the evidence in the record supports the district court's conclusion that Defendant was not in custody because a reasonable person undergoing the interrogation would believe that he was free to leave. In reaching this conclusion, we find a number of cases instructive.

**{14}** In *Munoz*, 1998-NMSC-048, ¶¶ 2-3, 40-44, our Supreme Court declined to conclude that the defendant was the subject of a custodial interrogation when he was questioned by FBI agents in their vehicle about a murder. The Court noted that the defendant accompanied the agents voluntarily and was informed that he was not under arrest, was provided a formal warning that he did not have to accompany the agents or answer any of their questions, and was told that he could leave at any time. *Id.* ¶¶ 5, 43. During the course of the interview, the defendant was neither handcuffed nor searched. *Id.* ¶ 43. There was no indication that the car doors were locked or that the defendant was otherwise prevented from leaving the car, which was parked in a public lot during daylight hours. *Id.* At the conclusion of the interview, the defendant was returned home. *Id.* Although the defendant had become the focus of the investigation and ultimately confessed to the murder, our Supreme Court concluded that *Miranda* had not been triggered. *Id.* ¶¶ 42, 44.

10

**{15}** In *Nieto*, 2000-NMSC-031, our Supreme Court refused to conclude that the interrogation of the defendant was custodial simply because the defendant was questioned by a police detective in a small office, with the defendant's back to the wall, and with an officer between the defendant and the closed doorway. *Id.* ¶ 21. The Court noted that "these facts, as well as the trial court's findings that [the d]efendant was asked and agreed to accompany police officers to the station, was free to leave or terminate the interview, and was provided transportation to and from the station, are consistent with routine, non-custodial police questioning." *Id.*

**{16}** This Court also considered whether an interrogation at a police station was custodial in *State v. Bravo*, 2006-NMCA-019, 139 N.M. 93, 128 P.3d 1070. In *Bravo*, the defendant was questioned at a police station after officers asked her if she would be willing to give a second statement following the death of her son. *Id.* ¶¶ 1, 12. She voluntarily drove to the police station and was interrogated for approximately two hours. *Id.* ¶¶ 12-13. During the course of the interview, she was not placed in handcuffs. *Id.* ¶ 13. Despite essentially confessing to the crime of child abuse resulting in death, she was free to leave the station at the conclusion of the interview. *Id.* This Court found that, given these facts, substantial evidence supported the district court's finding that the defendant was not in custody and therefore was not entitled to *Miranda* warnings. *Id.*

11

**{17}** In *Wilson*, our Supreme Court again revisited whether interrogation of the defendant in a police station constituted a custodial interrogation. 2011-NMSC-001, ¶¶ 47-49. In *Wilson*, the defendant was escorted to an interview room with recording capabilities. *Id.* ¶ 47. He was told he was not under arrest and under no obligation to speak with the detective. *Id.* The defendant was also advised that he was free to stop the interview and leave at any time. *Id.* The defendant was questioned for two to three hours and ultimately confessed to killing his foster son. *Id.* ¶¶ 1, 47. The Supreme Court concluded that "the police encounter was non-coercive and unintimidating, and that a reasonable person in [the d]efendant's position would have believed the interview could have been terminated at any point." *Id.* ¶ 49.

**{18}** In the present case, the totality of the circumstances indicates that the interrogation of Defendant was non-custodial. Although Defendant was interviewed at a police station, he arrived at the station on his own accord as in *Wilson*, *Nieto*, and *Bravo*. *See Wilson*, 2011-NMSC-001, ¶ 49 ("[The defendant] drove to the police station in [his] own vehicle."); *Nieto*, 2000-NMSC-031, ¶ 21 ("[The d]efendant was asked and agreed to accompany police officers to the station[.]"); *Bravo*, 2006-NMCA-019, ¶ 12 ("[The d]efendant . . . agreed to be interviewed and followed the officers to the police station in [her] own personal vehicle."). Upon arriving at the police station, Defendant was taken to an interview room for questioning. Although

the room was in a secured area of the station, Defendant was explicitly told on multiple occasions that he was free to leave and that he was not under arrest. *See Wilson*, 2011-NMSC-001, ¶ 47 (indicating that the interrogation was not custodial, in part because the defendant was advised that he was not under arrest and could stop the interview and leave at any time); *Nieto*, 2000-NMSC-031, ¶ 21 (stating that the defendant "was free to leave or terminate the interview"); *Munoz*, 1998-NMSC-048, ¶¶ 43-44 (holding an interrogation to be non-custodial in part because the defendant was told that he was free to leave at any time and would not be under arrest). The detectives explained that the door was only closed for privacy and that he did not have to answer the detectives' questions. *See Munoz*, 1998-NMSC-048, ¶ 43 (stating that there was no indication that the car doors were locked and that the agents told the defendant that "he did not have to answer any of their questions or talk to them" as supporting factors for the conclusion that the interrogation was non-custodial). The detectives sat across from Defendant during the interview and did not obstruct his path to the door, had he chosen to leave. Defendant was in no way constrained, either by handcuffs or some other method. *See id.* (stating that the agents "did not handcuff [the defendant], nor did they search him"); *Bravo*, 2006-NMCA-019, ¶ 13 (listing the fact that the defendant "was never placed in handcuffs" as a factor that supported the district court's conclusion that the defendant was not in custody). At the conclusion

13

of the interview, Defendant actually left the police station. *See Munoz*, 1998-NMSC-048, ¶ 43 ("After the interview was completed, the agents indeed took [the d]efendant home."); *Bravo*, 2006-NMCA-019, ¶ 13 ("[D]espite her confession, [the d]efendant was allowed to go home . . . at the conclusion of the interview.").

{19}    We also do not believe that the length of the interrogation or duration of the detention supports Defendant's argument that he was not free to leave. Defendant's interrogation lasted just over an hour, including the time during which the interview was suspended pending resolution of Defendant's medical issue. *See Wilson*, 2011-NMSC-001, ¶¶ 47, 49 (concluding that an interview lasting between two and three hours did not implicate *Miranda* because a reasonable person in the defendant's position would have believed the interview could be terminated); *Munoz*, 1998-NMSC-048, ¶¶ 42-44 (concluding, after considering the particular facts of the interrogation, that a one hour and forty minute interrogation was not custodial); *Bravo*, 2006-NMCA-019, ¶ 13 (concluding that the interview, which lasted approximately two hours, was not custodial). In fact, after Defendant's seizure, the detectives concluded the interrogation and urged that the interview be over. At no time did Defendant request a break or indicate that he wished to end the interrogation.

{20}    We also do not believe that Defendant was faced with a degree of pressure that would suggest he was not free to leave. Defendant's argument that the pressure was

evident from his seizure reaction is not compelling. According to Defendant, his seizures are stress-related. However, he also indicated that he has a history of seizures, and in fact, he had suffered from a seizure one day prior. Additionally, just before Defendant began convulsing, he expressed that the concern was not going to jail, but rather losing contact with Child. This concern, which is not apparently tied to whether a reasonable person would feel free to leave the interrogation, was consistent throughout the interview and could also have been the trigger for his seizure. Defendant now asserts that the interrogation was the source of stress, however, neither in his motion to suppress nor during the hearing on the motion did Defendant offer testimony (either himself or from a medical provider) to explain his medical history or his triggers. We decline to suppress statements based on mere speculation as to the reason for Defendant's seizure.

{21} The extent to which Defendant was confronted with evidence of guilt likewise was insufficient to make the interrogation custodial. Although the detectives did indicate that they had spoken with Child and also stated that they had possession of Child's phone, they did not threaten Defendant or assert that he was going to be arrested for a crime. *See Munoz*, 1998-NMSC-048, ¶¶ 8, 43-44 (declining to conclude that the interrogation was custodial even though the agent told defendant that he already knew the essential facts of the crime and urged the defendant not to lie). In

fact, as indicated earlier, the detectives specifically told Defendant that he was not under arrest. Regardless of any acknowledgment by the detectives that Defendant could be in trouble, the overall degree of pressure was minimal, and as in *Wilson*, "the police encounter was non-coercive and unintimidating[.]" 2011-NMSC-001, ¶ 49. Thus, we conclude that a reasonable person would believe that they were free to leave the interrogation.

{22}     The remaining factor in regard to the suppression issue is the purpose of the interrogation. According to the record, the detectives interviewing Defendant indicated that prior to the interrogation, they had received a report alleging that Defendant was in a relationship with Child. The record also indicates that prior to Defendant's interrogation, they had spoken with Child and had confiscated Child's phone. Thus, at the time they interrogated Defendant, he was their sole suspect. Although we conclude this factor potentially weighs in favor of determining that Defendant was in custody, we also note that the fact that Defendant was the focus of a police investigation is insufficient by itself to trigger *Miranda* requirements. *See Munoz*, 1998-NMSC-048, ¶ 42 ("It is also true that [the d]efendant had become the focus of the police investigation, but this factor alone is not enough to trigger the need to give warnings."). In the present case, as in *Munoz*, when considered as part of the totality of the circumstances, which included specific statements by law enforcement

16

that Defendant was free to leave, a reasonable person would believe that they were free to leave during the interrogation.

{23} We conclude that under the totality of circumstances, a reasonable person would feel free to leave during Defendant's interrogation. Neither the environment of the interrogation, nor the detectives' tactics during the interview indicate that Defendant's freedom of movement was restrained. We therefore conclude that Defendant was not in custody and the detectives were not required to give *Miranda* warnings.

**Jury Instruction**

{24} Defendant's second argument on appeal is that the district court instructed the jury with a patently erroneous definition of "obscene" resulting in fundamental error. Defendant argues that the definition provided was misleading because it suggested that any image of Defendant's intimate parts is, by definition, obscene. Defendant does not object to the instruction describing the elements of criminal sexual communication with a child.

{25} Defendant did not object to the jury instruction in the district court and thus argues on appeal that the given instruction constitutes fundamental error. *See* Rule 12-216(B)(2) NMRA ("This rule shall not preclude the appellate court from considering . . . questions involving . . . fundamental error[.]"); *State v. Barber*, 2004-NMSC-019,

17

¶ 8, 135 N.M. 621, 92 P.3d 633 ("The doctrine of fundamental error applies only under exceptional circumstances and only to prevent a miscarriage of justice."). "[F]undamental error occurs where there has been a miscarriage of justice, the conviction shocks the conscience, or substantial justice has been denied." *State v. Cabezuela*, 2011-NMSC-041, ¶ 49, 150 N.M. 654, 265 P.3d 705 (internal quotation marks and citation omitted). Error that is fundamental "must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive. Each case will of necessity, under such a rule, stand on its own merits." *Barber*, 2004-NMSC-019, ¶ 8 (internal quotation marks and citation omitted).

{26} The at-issue instruction stated: "Obscene definition; 'intimate parts' means the primary genital area, groin, buttocks, anus[,] or breast." Defendant argues that the definition does not define "obscene" and further that the drafting suggests that any intimate parts should be categorized as obscene.

{27} While we agree that the drafting of the definition was less than ideal, the failure to remove the phrase "obscene definition" or else provide a clear definition of "obscene" does not rise to the level of fundamental error. The appellate courts' "task is to determine whether a reasonable juror would have been confused or misdirected by the jury instruction." *State v. Cunningham*, 2000-NMSC-009, ¶ 14, 128 N.M. 711,

18

998 P.2d 176 (internal quotation marks and citation omitted). We do not believe that a reasonable juror would have been confused by the jury instruction. The instructions offered to the jury provided the relevant elements of the crime. The lack of a specific definition of the term "obscene" does not mean that the jury could not have determined how to properly consider whether Defendant was guilty of the overarching crime. We conclude that a reasonable juror could reach the conclusion that an adult male sending nude photos of his penis and a video of himself masturbating was "obscene" without a specific definition of the term. Defendant seems to suggest that by listing intimate parts after "obscene," the jury would be misled into finding Defendant guilty, when it otherwise may not have, had it been properly instructed on how to evaluate the term "obscene." We are unconvinced that the instruction misled the jury, and Defendant fails to offer convincing evidence or argument to the contrary. Even if the presentation of the jury instruction was less than ideal, we do not hold that a reasonable jury would be confused about whether nude photos and video from an adult to a child were contrary to the statute or that any potential confusion rose to the level of fundamental error.

**CONCLUSION**

{28}    We hold that the district court properly denied Defendant's motion to suppress. We also hold that the problematic jury instruction regarding the definition of

"obscene" did not constitute fundamental error. We therefore affirm Defendant's conviction.

{29}    **IT IS SO ORDERED.**


_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**


_____
**MICHAEL D. BUSTAMANTE, Judge**


_____
**M. MONICA ZAMORA, Judge**