This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO**,

Plaintiff-Appellee,

v.                                        **No. 33,699**

**MARTIN LOPEZ**,

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Douglas R. Driggers, District Judge**

Hector H. Balderas, Attorney General
Maha Khoury, Assistant Attorney General
Santa Fe, NM

for Appellee

L. Helen Bennett, P.C.
L. Helen Bennett
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**FRENCH, Judge**.

{1} Martin Lopez (Defendant) appeals his convictions of three counts of first-degree criminal sexual penetration of a minor and one count of second-degree criminal sexual contact of a minor. Defendant advances four arguments for reversal: (1) it was fundamental error to admit the testimony of police investigator Robert Hernandez (Investigator Hernandez), (2) ineffective assistance of counsel, (3) the district court failed to conduct a fair trial, and (4) the district court improperly denied Defendant's motion for a new trial. We affirm after considering each argument.

**BACKGROUND**

{2} Defendant was accused of sexual abuse by his former foster child (Child) approximately two years after she left his home. During the time the police were investigating Child's allegations, Defendant "got information" that his sons were involved in criminal activity and went to the police station under that pretense. There, Investigator Hernandez and Investigator Richard Chavez (Investigator Chavez) questioned Defendant in tandem about Child's allegations. They spoke with Defendant for approximately seventy-seven minutes, including an eleven minute break. Defendant verbally indicated that he understood that he was not under arrest, was free to leave, and was not obligated to answer any questions. He did not receive a statement of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

**{3}** At trial, Child testified that Defendant forced her to perform sexual acts when she was five years old and lived in his home. Child testified in explicit detail, including accusations that Defendant coerced Child to perform sexual acts in order to obtain food she and her brothers needed. She testified that Defendant would hit or kick her if she did not comply or "for not doing a good job," and that his physical abuse caused bruises. Child also told the jury that she was forced to "sit on the floor for hours picking up like grains of sand, stuff that you can't even see, like stuff you could get with a vacuum cleaner" and that Defendant put a spider in her bedroom and wouldn't remove it. Child explained that she did not tell anyone about the abuse earlier than she did because Defendant had told her not to tell anyone, threatened to hurt her if she did, and because she did not feel that she could trust anyone until, eventually, she came to trust her stepmother and father. Child was thirteen years old when she testified at trial.

**{4}** Investigator Hernandez testified about Defendant's interview at the police station. Defendant, according to Investigator Hernandez's testimony, repeatedly denied engaging in sexual activity with Child. However, Investigator Hernandez testified that Defendant wavered back and forth about whether Child was a liar:

> At first, he would say that she's lying. Then when asked if a little five-year-old girl is going to lie, he said, [w]ell, she's not lying. And we tried to explain to him that he couldn't have it 50/50, either she's lying or she's not. And he would indicate, [w]ell, she's not lying, but she's not telling the truth.

3

He also testified that Defendant talked "in circles a lot[,]" was "very elusive, . . . nervous, . . . shaking[,]" and had trouble remembering simple things, such as the number of bedrooms in his house and his address.

{5}     Two of Defendant's sons, his wife (Wife), and Defendant himself testified on his behalf. They presented a dramatically different version of life in the home than Child. According to the testimony of one of the Defendant's sons, the family ate dinner together as a routine, including Child and her two younger brothers. Defendant and Wife chose to bring Child and her brothers along for two family vacations—including a trip to California to attend their eldest son's graduation from the Marines—despite the option to place them in respite care with another foster family. Both of Defendant's sons who lived in the home testified that they did not see any bruises or injuries on Child and, had they seen any, they would have reported their observations to their mother.

{6}     Wife testified that she and Defendant had been married for thirty years. She testified that she went to church with Child four times a week, and that Child wore a dress on those occasions. Wife testified that she was a light sleeper, and that Child slept in a bedroom with a common wall to the bedroom she shared with Defendant. Wife testified that she could hear and feel her husband rise from the bed to use the bathroom, that she rose in the night two or three times to care for the infant in the

4

home, and there was never a time when she felt that Defendant was out of bed for an unusually long time. Child played on the family's trampoline, played with the family ducks, and referred to Wife and Defendant as "Mrs. Duckling" and "[D]addy." She testified that Child received three meals a day, plus snacks, and was a "big eater." Defendant and Wife attempted to adopt the younger of Child's brothers, but were unsuccessful because an adoption was already underway.

{7}    Defendant testified that he left high school before graduation and worked in pecan fields for more than thirty-five years. He testified that he generally worked from 7:00 a.m. to 5:00 p.m. during the week, and 7:00 a.m. to 12:00 p.m. on Saturday. For approximately two months during the winter, Defendant worked seven days a week from 7:00 a.m. to 6:00 p.m. According to Defendant, he did not drink, smoke, take drugs, or any medication for any purpose. He asserted that his questioning in connection with this case was the first time he was ever questioned by the police. Defendant confirmed at trial that, during his questioning by the police, he stated that he went to the police station of his own volition and understood that he was not under arrest and was free to leave at any time. Defendant testified that he did not sexually abuse Child.

{8}    The jury convicted Defendant on all charged counts.

**{9}** After trial, Defendant filed a motion for a new trial on the basis of newly discovered evidence. The new evidence was a neuropsychological evaluation by Dr. Noah K. Kaufman that was ordered as a pre-sentencing evaluation. Before the hearing on the motion for a new trial, but after Defendant filed his written motion, Dr. Kaufman performed a second evaluation and wrote an additional report. Dr. Kaufman concluded that Defendant had poor language and cognitive skills, and was highly suggestible to leading questions. Defendant argued that a new trial was warranted on the basis of Dr. Kaufman's evaluations and the findings in the report. On behalf of the State, Dr. Edward Siegel also conducted an evaluation of Defendant. Dr. Siegel concluded that Defendant had been—and remained—competent to stand trial, was capable of independent decisions, and decided to remain at the interview with the police even though he was not under arrest and was free to leave. After a hearing, the district court denied Defendant's motion for a new trial and additionally found Defendant competent.

**{10}** Defendant also filed a motion for a new trial in the interest of justice pursuant to Rule 5-614 NMRA. In part, Defendant argued that Child's testimony "simply made no sense, and raised the prospect of a troubled mind[,]" and, in contrast, the testimony on behalf of Defendant "was logically consistent and reasonable." Defendant's fundamental contention was that the jury's verdict was not supported by the evidence.

Defendant's motion for a new trial in the interest of justice was denied. This appeal followed. Additional facts will be added as needed in the following analysis.

**DISCUSSION**

**A.     Admission of Investigator Hernandez's Testimony**

{11}     Defendant contends that he is entitled to a new trial because his statements to Investigators Hernandez and Chavez should have been suppressed. Defendant argues that the district court committed error by allowing Investigator Hernandez to testify about Defendant's statements. Defendant advances two distinct arguments. First, that Defendant did not make a valid waiver of his *Miranda* rights. Second, that Defendant was improperly interrogated, rendering his statements involuntary. As explained below, we do not embrace either argument.

{12}     Defendant's claim of error that his statements to the police should have been suppressed was not preserved—he did not, for example, object or file a motion to suppress. Therefore, we review his arguments only for fundamental error. *See* Rule 12-216(A) NMRA (stating that preservation of a question for appellate review requires a ruling or decision of the district court); Rule 12-216(B)(2) (stating that unpreserved questions involving fundamental error or the fundamental rights of a party may be reviewed on appeal). We reverse for fundamental error only to correct injustices that shock the conscience of the court. *State v. Saiz*, 2008-NMSC-048, ¶ 59,

7

144 N.M. 663, 191 P.3d 521, *abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36 n.1, 146 N.M. 357, 210 P.3d 783. Such injustices may be procedural or substantive. "[A] mistake in the process [that] makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused" is fundamental error, as is the conviction of an "indisputably innocent" defendant. *Saiz*, 2008-NMSC-048, ¶ 59 (internal quotation marks and citation omitted). The threshold inquiry of fundamental error review is to determine whether there was error. *State v. Silva*, 2008-NMSC-051, ¶ 11, 144 N.M. 815, 192 P.3d 1192.

## I.      Defendant's *Miranda* Rights

{13}      The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend V. From that right flows the holding of *Miranda*: before being subjected to a custodial interrogation, a person "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. The right to a *Miranda* warning is triggered when a person is both interrogated and in custody. *State v. Wilson*, 2011-NMSC-001, ¶ 48, 149 N.M. 273, 248 P.3d 315, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37, n.6, 275 P.3d 110.

8

**{14}** We examine first whether Defendant was in custody. A person is in custody if under formal arrest or if a person's movement is restrained to the degree associated with a formal arrest. *State v. Nieto,* 2000-NMSC-031, ¶ 20, 129 N.M. 688, 12 P.3d 442. Our inquiry into whether a person was in custody is objective, requiring that we determine whether, under all the circumstances, "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, ___ U.S. ___, ___, 132 S. Ct. 1181, 1189 (2012) (alteration, internal quotation marks, and citation omitted); *see also State v. Snell*, 2007-NMCA-113, ¶ 10, 142 N.M. 452, 166 P.3d 1106 ("A suspect is in custody for the purpose of *Miranda* if a reasonable person in his position would believe he was not free to leave the scene of the interrogation.").

**{15}** Defendant has not developed an argument that he was in custody. Instead, Defendant merely contends that "even a cursory examination of the transcript of the event demonstrates" that he was in custody. We disagree.

**{16}** At trial, Defendant confirmed statements made to the police during the questioning: namely, that he went to the police station of his own accord, and understood that he was free to leave and not under arrest. Moreover, Defendant did not testify at trial that during the questioning he felt as though he was in custody or not free to leave. Thus, we conclude that Defendant understood that he was at liberty

9

to conclude the interview and leave the police station at any time. That is to say, although Defendant argues on appeal that we should determine that his liberty was constrained, the record does not support an inference that Defendant believed himself to be in custody.

{17}   Nevertheless, we objectively examine whether a reasonable person in Defendant's circumstances "would have felt he . . . was not at liberty to terminate the interrogation and leave." *Howes*, ___ U.S. at ___, 132 S. Ct. at 1189 (alteration, internal quotation marks, and citation omitted). The fact that the questioning took place in a room at the police station does not, of itself, render the questioning custodial. *See State v. Munoz*, 1998-NMSC-048, ¶ 44, 126 N.M. 535, 972 P.2d 847, (citing *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977) (stating that, without restraint on movement or formal arrest, questioning a suspect in a coercive environment such as a police station does not convert "a noncustodial situation . . . to one in which *Miranda* applies")); *Nieto*, 2000-NMSC-031, ¶ 21 (holding that an interview was non-custodial when the suspect was interviewed in a room in a police station with the door closed and the suspect's back to a wall with an officer between the suspect and the door, accompanied the police to the interview at their request, was transported to and from the police station, and was free to terminate the interview and leave at any time). The questioning, from which Defendant was by all appearances free to leave at any

time, lasted approximately seventy-seven minutes. At the conclusion of the interview, Defendant left. We conclude that a reasonable person in Defendant's shoes would have felt, as did Defendant, that his or her liberty was unconstrained during the interview. Therefore, Defendant was not in custody. *See Howes*, ___ U.S. at ___, 132 S. Ct. at 1189 (stating that the initial inquiry into "whether a person is in custody" is whether a "reasonable person" in the shoes of the defendant "would have felt" at liberty to conclude the questioning and leave (alteration, internal quotation marks, and citation omitted)); *Snell*, 2007-NMCA-113, ¶ 10 ("A suspect is in custody for the purpose of *Miranda* if a reasonable person in his position would believe he was not free to leave the scene of the interrogation.").

{18}     Because Defendant was not in custody, he was not entitled to a *Miranda* warning. *See Wilson*, 2011-NMSC-001, ¶ 48 (stating that a person is not entitled to a *Miranda* warning unless interrogated while in custody). Thus, the admission of his un-*Mirandized* statements through the testimony of Investigator Hernandez was not error.

**II.    The Interview**

{19}     Defendant contends that his statements to the police were not voluntary but, instead, coerced. He argues that he was interrogated improperly and, as a consequence of official overreaching by the police, his statements should have been excluded.

Defendant states that the police overreached because they used what Defendant refers to as the "Reid Technique" and further, that his interrogation exceeded the standards of that technique.[1] Moreover, argues Defendant, our analysis should be informed by Defendant's "physical and mental state . . . , as depicted by Dr. Kaufman."

{20}     Use at trial of a statement or confession that was not voluntary does not comport with federal due process requirements. *See State v. Trujillo*, 1979-NMCA-055, ¶ 22, 93 N.M. 728, 605 P.2d 236 ("[A]*ny* criminal trial use against a defendant

---

[1]The Reid Technique is "probably the most widely used method of interrogation in the United States[.]" Tracy Lamar Wright, *Let's Take Another Look at that: False Confession, Interrogation, and the Case for Electronic Recording*, 44 Idaho L. Rev. 251, 260 (2007); *see also* Charles D. Weisselberg, *Mourning Miranda* 96 Cal. L. Rev. 1519, 1530 (2008) ("The largest national provider of training in interrogation techniques is Chicago-based John E. Reid & Associates."). "The underlying philosophy . . . is simple: a suspect will not confess unless he perceives it to be in his best interest to do so, and it is the job of the interrogator to engender this belief." Wright, *supra*, at 262. The Reid Technique recommends that the subject be isolated in a private, sparsely furnished, quiet room. Weisselberg, *supra*, at 1532. The technique consists of nine steps: (1) "a direct, positively presented confrontation of the suspect with a statement that he is considered to be the person who committed the offense"; (2) introduction of "a theme for the interrogation, a reason for the commission of the crime, which may be a moral (but not legal) excuse or a way for the suspect to rationalize her actions"; (3) "overcoming denials"; (4)-(6) "overcoming the suspect's reasons why he would not or could not commit the crime, keeping the suspect's attention and handling a suspect's passive mood"; (7) a "critical" step where "the officer formulates alternative questions, one of which is more acceptable or understandable than the other. The question is followed by a statement of support for the more morally acceptable alternative. However, whichever alternative is chosen by the suspect, the net effect will be the functional equivalent of an incriminating admission"; (8)-(9) "taking the suspect's oral statement and converting it to a written confession." *Id.* at 1532-33 (alterations, internal quotation marks, and citations omitted).

of his *involuntary* statement is a denial of due process of law, even though there is ample evidence aside from the confession to support the conviction." (citing *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) (internal quotation marks and citation omitted))). Pursuant to the Due Process Clause of the Fourteenth Amendment, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned[.]" *Munoz*, 1998-NMSC-048, ¶ 20.

**{21}** In the absence of official coercion, a statement or confession is voluntary. *See Munoz*, 1998-NMSC-048, ¶ 21 ("Voluntariness means freedom from official coercion." (internal quotation marks and citation omitted)). If a statement is the product of official coercion that led to a defendant's will being overborne and his or her capacity for self-determination critically impaired, then the defendant's statement is inadmissible. *Id.* ¶ 20. Conversely, if a statement is the result of an "essentially free and unconstrained choice[,]" then it may be used in court. *Id. ¶* 21. "On appeal, we review the totality of the circumstances to determine independently whether the prosecution has proved that a confession was given voluntarily[,]" *id*. ¶ 23 (internal quotation marks and citation omitted), including "both the characteristics of the accused and the details of the interrogation[.]" *State v. Ruud*, 1977-NMCA-072, ¶ 12, 90 N.M. 647, 567 P.2d 496.

{22} Defendant contends that there are two factors that render his statements legally involuntary when examined under our totality of the circumstances test: (1) the use, and misuse, of the Reid Technique of interrogation by the police, which constituted official overreaching; (2) the mental and physical condition of Defendant. We first examine Defendant's contention about the police use of the Reid Technique of interrogation.

{23} When examining whether a state actor has coerced a defendant into making an involuntary statement, "[the appellate courts] look to whether the police used fear, coercion, hope of reward, or some other improper inducement." *State v. Cooper*, 1997-NMSC-058, ¶ 44, 124 N.M. 277, 949 P.2d 660. In this case, Defendant has not made such a demonstration. Defendant has not asserted that the questioning was extraordinarily long, and it wasn't—seventy-seven minutes with an eleven minute break. C*f. Munoz*, 1998-NMSC-048, ¶¶ 35-37 (holding that a 100 minute interrogation did not weigh in favor of a confession being involuntary and citing to cases in which much longer interrogations did not invalidate a confession for involuntariness). Defendant has not asserted that the police threatened him or made any promise to him that would constitute an improper inducement. *Cf. Aguilar v. State*, 1988-NMSC-004, ¶¶ 3, 12-14, 106 N.M. 798, 751 P.2d 178 (concluding that statements were involuntary where the defendant's mental impairments were known to his interrogator, and the

14

interrogator used a combination of threats of additional charges and promises of leniency to induce a confession). Defendant was free to leave and was not physically uncomfortable. *See State v. Juarez*, 1995-NMCA-085, ¶ 19, 120 N.M. 499, 903 P.2d 241 (stating that an involuntary statement can result from physical discomfort during questioning); *cf. Mincey*, 437 U.S. at 399 (concluding that statements were involuntary where the defendant was interrogated while seriously wounded and in the hospital, "encumbered by tubes, needles, and breathing apparatus" and "at the complete mercy" of his interrogator (internal quotation marks omitted)). In sum, the circumstances of the interview were not extraordinary and do not give us pause from the standpoint of applicable constitutional authority. Accordingly, Defendant's general argument that his interrogation was overzealous is unpersuasive. Although Defendant contends that the police used "[m]any of the [Reid T]echniques," the label applied to the activities of the police is unimportant. Instead, we measure whether a person's due process rights were violated by the activities of the police and the totality of the circumstances of the interrogation. *Cf. State v. Gutierrez,* 2011-NMCA-024, ¶¶ 23-24, 150 N.M. 232, 258 P.3d 1024 (stating that when analyzing whether the use of a confession violates due process, the district court considers a "litany" of factors, including factors directed toward both the details of the interrogation and the characteristics of the accused).

15

**{24}** Defendant also argues that, given his mental and physical condition, the interrogation rendered his statements involuntary. We observe initially that Defendant has not noted any physical condition or physical discomfort that he suffered. Also, although Defendant contends that his mental state was "a context affecting what must be regarded as coercive and overreaching[,]" he does not explain or make argument other than to refer generally to Dr. Kaufman's post-conviction evaluation. In any case, Dr. Kaufman found that Defendant had poor English language skills, poor cognitive skills, and was more likely to yield to leading questions than ninety-eight percent of his comparison group. Dr. Siegel, who performed a post-conviction report on behalf of the State, concluded that Defendant was competent to stand trial and had the "ability to arrive at independent decisions even when guided by an attorney."

**{25}** The question we face is whether Defendant's will was overborne and his capacity for self-determination critically impaired under the circumstances of the interview and given his mental deficits. *See State v. Evans*, 2009-NMSC-027, ¶ 33, 146 N.M. 319, 210 P.3d 216 (stating that the question of whether a confession was voluntary turns on whether "a defendant's will has been overborne and his capacity for self-determination has been critically impaired" (alteration, internal quotation marks and citation omitted)). We conclude that it was not. First of all, we note that Defendant repeatedly denied his guilt and never confessed. The tenor of his statements

16

throughout the interview was not of resignation or admission but, instead, willful denial of guilt:

Q:   Well did you . . . have you had any relationships with her?
A:   No, what do you mean?

Q:   Like touched her inappropriately, . . . talked to her inappropriately or anything like that?
A:   No.

Q:   No?
A:   No.

. . . .

Q:   Did you show her? Did she ever see your #1?
A:   No. No. No. . . . 'Cause I know.

. . . .

Q:   But you need to come out and tell me because I'm . . . I'm . . . I'm not gonna sit here and play these word games with you. Okay. Because you know right now in your head that something happened . . .
A:   No.

Q:   And you're . . . and you're nervous.
A:   Nothing happened.

. . . .

Q:   And it wasn't supposed to happen, exactly and people make mistakes, is that correct?
A:   But it didn't happen.

Q:   It never happened?
A:   No.

17

. . . .

Q: Did you want to tell me the truth?
A: About what?

Q: About you and [Child?]
A: Nothing . . . nothing happened.

Q: And that's it, you're not gonna . . . that's the story you're gonna
    stick with?
A: [N]ot that I'm gonna stick with it, nothing happened.

. . . .

Q: Cause you know it's a lie.
A: No, it's not.

Q You . . . you know it's a lie.
A: You're saying it's a lie.

Q: You know it's a lie. [Interview concludes]

Moreover, when Defendant later discussed with Dr. Siegel his reasons for remaining in the interview, Defendant is quoted by Dr. Siegel as stating "to stay and clear things up." Neither our review of the interview, nor Defendant's retrospective understanding, indicate that his will was overborne.

{26}    We conclude under the totality of the circumstances, including the conduct of the police, the circumstances of the interview, and Defendant's mental condition, that his will was not overborne nor was his capacity for self-determination critically impaired. Thus, Defendant's statements were the product of an "essentially free and

unconstrained choice" and were not improperly used against him at trial through the testimony of Investigator Hernandez. *See Munoz,* 1998-NMSC-048, ¶ 21 (stating that when a statement is the product not of a person's overborne will or critically impaired capacity for self-determination but, instead, an essentially free and unconstrained choice, then the statement is admissible in court).

**B.      Ineffective Assistance of Counsel**

{27}      Criminal defendants are entitled to " 'reasonably effective' assistance of counsel" pursuant to the Sixth Amendment of the United States Constitution. *State v. Garcia*, 2011-NMSC-003, ¶ 33, 149 N.M. 185, 246 P.3d 1057. A successful ineffective assistance of counsel claim requires that a defendant demonstrate both that counsel erred and that the error prejudiced the defendant. *State v. Arrendondo*, 2012-NMSC-013, ¶ 38, 278 P.3d 517.

{28}      There is a strong presumption that counsel has not erred unreasonably but, instead, that counsel's performance "falls within the wide range of reasonable professional assistance." *Garcia*, 2011-NMSC-003, ¶ 33 (internal quotation marks and citation omitted). A defendant demonstrates that counsel's error caused prejudice when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Bernal*, 2006-NMSC-

050, ¶ 32, 140 N.M. 644, 146 P.3d 289 (internal quotation marks and citation omitted).

{29} We evaluate an ineffective assistance of counsel claim raised on direct appeal only on the basis of the facts in the record. *State v. Crocco*, 2014-NMSC-016, ¶ 14, 327 P.3d 1068. Because facts not in the record are often necessary to fully determine whether an action taken by defense counsel was not reasonable or if an error caused prejudice, ineffective assistance of counsel claims are often better addressed through habeas corpus proceedings. *Arrendondo*, 2012-NMSC-013, ¶ 38. In fact, our appellate courts prefer that ineffective assistance of counsel claims are brought by a petition for writ of habeas corpus. *State v. Baca*, 1997-NMSC-059, ¶ 25, 124 N.M. 333, 950 P.2d 776. However, if on direct appeal a defendant makes a prima facie case for ineffective assistance of counsel on the basis of facts in the record, an appellate court can remand to the district court for an evidentiary hearing. *Crocco*, 2014-NMSC-016, ¶ 14. A defendant makes a prima facie case when the defendant produces sufficient evidence to allow the trier of fact to infer the fact at issue and rule in the defendant's favor. *Id.* When there is a "plausible, rational strategy or tactic to explain the counsel's conduct[,]" a prima facie case for ineffective assistance of counsel is not made. *State v. Astorga*, 2015-NMSC-007, ¶ 18, 343 P.3d 1245 (internal quotation marks and citation omitted).

{30} Defendant argues that his counsel was ineffective because counsel failed to: (1) object to the testimony of Investigator Hernandez; (2) investigate Child's civil claims against CYFD; (3) investigate Child psychologically; (4) obtain a report on Defendant from Dr. Kaufman prior to trial. We evaluate Defendant's arguments in turn.

{31} Defendant's counsel was not ineffective for failure to object to the testimony of Investigator Hernandez. As stated in paragraph 27 of this opinion, we are not persuaded by Defendant's argument that Investigator Hernandez's testimony about Defendant's interview was improperly admitted. Thus, it was not error not to object to his testimony. Moreover, we are not persuaded that any error resulting in the admission of the testimony would have been prejudicial because Defendant denied his guilt repeatedly throughout the interview. The negative impact of Investigator Hernandez's testimony was not of such magnitude that we perceive a reasonable probability that Defendant would not have been convicted had the jury not heard it. Therefore, the prejudice prong also was not met. *See Bernal*, 2006-NMSC-050, ¶ 32 (stating that to prevail on an ineffective assistance of counsel claim, "[a] defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (internal quotation marks and citation omitted)). Because failing to object to the admission of Investigator Hernandez's testimony was not error and, even if error, such error was not prejudicial,

21

we decline to hold that Defendant has made a prima facie case for ineffective assistance of counsel on this basis. *See Arrendondo*, 2012-NMSC-013, ¶ 38 (stating that to prevail on an ineffective assistance of counsel claim requires both error by counsel and that the error prejudiced the defendant).

{32}    Defendant's remaining ineffective assistance of counsel arguments for counsel's failure to: (1) investigate Child's civil claims against CYFD, (2) investigate Child psychologically, and (3) obtain a report on Defendant from Dr. Kaufman prior to trial, are better brought by a petition for writ of habeas corpus. *See Crocco*, 2014-NMSC-016, ¶ 24 (noting that "[i]f facts beyond those in the record on appeal could establish a legitimate claim of ineffective assistance of counsel, [the d]efendant may assert it in a habeas corpus proceeding where an adequate factual record can be developed for a court to make a reasoned determination of the issues.").We examine Defendant's claims in turn. First, it is not clear from the record before this Court whether, or to what extent, counsel for Defendant investigated the purported civil lawsuit. Nor can Defendant demonstrate from the record whether Defendant suffered prejudice from this failure. Second, it is unclear from the record why counsel for Defendant did not investigate Child's psychological state. A reasonable attorney could have concluded after seeing Child's safehouse interview that it was not worth the risk of a psychological evaluation that would bolster Child's credibility or support a

conclusion that Child had been psychologically harmed by sexual abuse. Nor has Defendant demonstrated prejudice on the basis of the failure to investigate Child's psychological state from the record before this Court. Third, with regard to counsel's failure to "obtain the report of Dr. Kaufman prior to trial," Defendant has not demonstrated prejudice. Dr. Kaufman's report did not indicate that Defendant was incompetent, nor, as we concluded above, was it sufficient to exclude testimony about Defendant's interview. Also, a reasonable attorney might have chosen not to emphasize Defendant's potential neuropsychological deficits because Defendant's case at trial in large measure depended on his credibility and reliability. Finally, Dr. Kaufman indicated in his report that Defendant's neuropsychological deficits might not have been apparent—in other words, a reasonably competent attorney might not have noticed any reason to order such an evaluation. In sum, because each argument failed to demonstrate either counsel error on the basis of facts in the record, prejudice to Defendant due to counsel error, or both, Defendant has not made a prima facie case for ineffective assistance of counsel on the basis of his three remaining arguments. *See State v. Trujillo*, 2002-NMSC-005, ¶ 38, 131 N.M. 709, 42 P.3d 814 (stating that to establish ineffective assistance of counsel a defendant must point to "specific lapses" by trial counsel and demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different" (internal quotation marks and citation omitted)); *Baca*, 1997-NMSC-059, ¶ 25 (stating that "a prima facie case is not made when a plausible, rational strategy or tactic can explain the conduct of defense counsel" (internal quotation marks and citation omitted)); *State v. Howl*, No. 34,033, 2016 WL 3910915, 2016-NMCA-___, ¶ 10, ___ P.3d ___ (July 14, 2016) (stating that a prima facie case of ineffective assistance is made only when a defendant can show both: "(1) that defense counsel's performance fell below the standard of a reasonably competent attorney, and (2) that due to the deficient performance, the defense was prejudiced." (internal quotation marks and citation omitted)). On the basis of Defendant's arguments and the record before this Court on direct appeal, Defendant was not denied effective assistance of counsel. Our ruling does not prevent Defendant from seeking collateral review of this issue in habeas proceedings. *See Crocco*, 2014-NMSC-016, ¶ 24, ("If facts beyond those in the record on appeal could establish a legitimate claim of ineffective assistance of counsel, [the d]efendant may assert it in a habeas corpus proceeding.").

**C.     The Trial**

{33}     Defendant argues that the trial was unfair and that the district court's failure to ensure a fair trial was an abuse of that court's discretion that requires us to remand for a new trial. In *State v. Grogan*, our Supreme Court stated that "in cases of obvious ineffective assistance of counsel, the trial judge has the duty to maintain the integrity

24

of the court, and thus inquire into the representation." 2007-NMSC-039, ¶ 10, 142 N.M. 107, 163 P.3d 494. The issue in *Grogan* was whether the district court abused its discretion by ordering a new trial *sua sponte* without even holding a hearing allowing the state to present evidence and argument on the basis of the district court's observation of ineffective assistance of counsel. *See id.* ¶ 8. The *Grogan* Court held that the district court did not abuse its discretion because the record supported the district court's finding of obvious incompetence by counsel and also "a sufficient showing of prejudice." *Id.* ¶ 18.

{34}     Defendant argues, citing *Grogan*, that the district court's failure to order a new trial *sua sponte* was an abuse of discretion because counsel failed to engage or request an expert to psychologically evaluate Child, failed to obtain a report from Dr. Kaufman for use at trial, and failed to "query regarding the admissibility of testimony from Investigator Hernandez." Defendant's argument recasts his failed ineffective assistance of counsel argument. We have already held that Defendant has not made a prima facie case for ineffective assistance of counsel. Accordingly, it was not an abuse of the district court's discretion to fail to order a new trial on the basis of obvious ineffective assistance of counsel.

**D.     Motion For a New Trial**

{35} Defendant argues that the district court abused its discretion when it denied Defendant's motion for a new trial in the interest of justice. Rule 5-614(A) NMRA provides that a court may grant a new trial to a convicted defendant in the interest of justice. The general rule is that a motion for a new trial is not favored. *State v. Armijo*, 1997-NMCA-080, ¶ 24, 123 N.M. 690, 944 P.2d 919. Although the district court may not replace its judgment for that of the jury "when there is such overwhelming evidence against conviction that it is apparent to the [district] court that injustice has been done, the court has the duty to grant a new trial." *State v. Griffin*, 1994-NMSC-061, ¶ 5, 117 N.M. 745, 877 P.2d 551. In order to make this determination, the court may re-weigh the evidence, including the credibility of the witnesses. *Id.* ¶ 6. On appeal, our appellate courts review the grant or denial of a new trial for "clear and manifest abuse of discretion." *State v. Chavez*, 1982-NMSC-108, ¶ 10, 98 N.M. 682, 652 P.2d 232.

{36} We conclude that the district court did not abuse its discretion in denying Defendant's motion for a new trial in the interest of justice. Defendant argues that the district court had a duty to grant a new trial because Child "should have been subjected to rigorous impeachment" and Investigator Hernandez should not have been allowed to testify and, therefore, the State's case rested on an "insufficient foundation." We disagree. This is not a case where there was overwhelming evidence

26

against the conviction. The explicit and detailed testimony of Child, which was not undermined by obvious indicia of unreliability, was a sufficient foundation to satisfy our appellate review of the district court's broad discretion to decline to order a new trial because the jury's verdict was unjust. *Cf. Griffin*, 1994-NMSC-061, ¶ 5 (stating that where there is overwhelming evidence against a conviction such that injustice has been done, a court has a duty to grant a new trial).

**CONCLUSION**

{37}    For the reasons stated, we affirm Defendant's convictions.

{38}    **IT IS SO ORDERED**.


_____
**STEPHEN G. FRENCH, Judge**


**WE CONCUR:**


_____
**M. MONICA ZAMORA, Judge**


_____
**J. MILES HANISEE, Judge**