**PONCA CITY PUBLIC SCHOOLS,**
**Petitioner,**

v.

**Harold RITCHESON, Deceased, Arleen Ritcheson, Claimant and the Workers' Compensation Court, Respondents.**

**No. 79775.**

Court of Appeals of Oklahoma,
Division No. 1.

March 9, 1993.

Certiorari Denied May 11, 1993.

---

Michael D. Gilliard, Tulsa, for petitioner.

Fred Boettcher, Ponca City, for respondents.

### MEMORANDUM OPINION

GARRETT, Judge:

Respondent Arleen Ritcheson (claimant) filed a Form 3–a, Claimant's First Notice of Death and Claim for Compensation, in the Workers' Compensation Court on July 25, 1989, after the death of her husband, Harold Vaughn Ritcheson, Deceased (Employee). She alleged his death, which occurred March 8, 1989, was the result of mental stress on his job with Petitioner Ponca City Public Schools (Employer). The cause of death is shown on the Form 3–a as "cardiorespiratory arrest". Employer filed a Form 2, Employers' First Notice of Injury, on August 10, 1989. It stated Employee suffered from a brain tumor or stroke, and that the working conditions were not a contributing factor to the stress he experienced due to a pending lawsuit. Employer alleged his death was not a result of his working relationship with Employer.

On January 22, 1992, the trial court entered an order awarding death benefits, finding that on March 8, 1989, Employee "sustained an accidental personal injury (STROKE) arising out and in the course and scope of deceased's employment with the respondent, from and as a result of which the deceased died on MARCH 8, 1989". The court found his dependent heirs-at-law were Claimant and Michelle Fairchild, dependent step-child of the Deceased. The court awarded lump sum payments to each dependent and ordered Employer to pay continuing benefits.

Employer filed a Notice of Appeal to the Workers' Compensation Court *En Banc.* On May 19, 1992, a three judge panel found the trial court's order was not against the clear weight of the evidence nor contrary to law, and sustained the order. One of the three judges on the panel dissented, stating: "I would allow the appointment of a third physician."

Three propositions of error are raised by Employer:

I. The findings of the trial court, affirmed by the court *en banc*, are not supported by any competent evidence, and such facts which were properly admitted at trial, when applied to the law of this State, do not support a work related injury resulting in death where the employee unreasonably and self-inducingly creates and sponsors the stress that brings about his eventual death;

II. The decision of the trial court, affirmed by the court *en banc*, rested on incompetent medical evidence made incompetent by the evaluating physician's failure to review and consider Employee's hospital records which revealed and supported causes of death other than job induced stress; and,

III. The trial court abused its discretion when it denied Employer's motion for the appointment of a substitute independent medical examiner (I.M.E.), after a determination by the court that the first I.M.E. had rendered himself incompetent to testify.

Employer contends that Employee suffered from self-induced and unreasonable stress, in that he unreasonably perceived Employer withdrew its support of him after a lawsuit was filed by a third party against Employer and Employee. Employer contends Employee worried himself to death about an event over which he had no control and that Employer should not be held accountable for his self-induced injury, arguably leading to his death. Employer cites *Decker v. Oklahoma State University*, 766 P.2d 1371 (Okl.1988), wherein the Supreme Court reversed the trial court's conclusion the claimant did not suffer an accidental personal injury arising out of and in the course of his employment. In *Decker*, supra, the Supreme Court held the evidence showed the claimant's supervisors and superiors knew of the on-the-job discord but did nothing about it and that the heart attack suffered by the claimant was caused by job related stress. Here, however, Employer contends, the anxiety stemmed from a third party, not Employer, accusing Employee of child abuse in his job as an elementary school principal.

Claimant testified that Employee's personality changed after learning of the lawsuit brought by parents of a school child against the district and Employee. She testified that after the lawsuit was filed and the investigation began, Employee's eating habits and his physical condition changed. There is testimony that before the lawsuit, Employee experienced no job-related stress. Claimant testified that after the child abuse allegations were made, Employee's behavior changed from being jovial to being very depressed. He had had no prior history of circulatory disease. A month after the lawsuit was filed, he was hospitalized. He developed a slight tingling in his right arm and leg and began dragging his leg. Claimant testified that newspaper articles in which Employer's superintendent was quoted as saying that the district had taken disciplinary action upset Employee and precipitated his stroke symptoms. She stated he worried all of the time about the lawsuit, allegations about his job performance and his reputation, and that it became an obsession with him.

■ Mental stress without accompanying physical injury is not compensable. *Fenwick v. Oklahoma State Penitentiary*, 792 P.2d 60 (Okl.1990). However, physical injuries caused by work-related mental stress are compensable. *Stiles v. Oklahoma Tax Com'n*, 752 P.2d 800 (Okl.1988); *Decker v. Oklahoma State University*, supra; *Oklahoma City v. Schoonover*, 535 P.2d 688 (Okl.1975). The instant case falls within the latter rule.

Claimant's medical expert, Dr. G., gave his medical opinion that Employee's death occurred as a result of his worry and stress over job performance. Specifically, Dr. G. testified in his deposition:

Q. How did the mental stress cause physical stress?

A. Well, because he got so upset about all this and he didn't function—none of his functions worked. His sympathetic nervous system wasn't working, his parasympathetic nervous system wasn't working.

Q. What do you mean his sympathetic nervous system—what does that mean?

A. The sympathetic nervous system is the nervous system that controls the pupil of the eye, the sweat glands, the sphincters in the intestine, all of the things you can't control yourself.

Q. When did he have trouble with those functions?

A. In the several months prior to his death.

Q. And can you give me some manifestations of that problem?

A. He would turn pale on hearing about this. Like I reported in here, he got pale when he heard this over the radio. That's sympathetic nervous system reaction. And all of this caused such a stress on him that he had this complete nervous system reaction.

Q. And what does that do?

A. That caused cerebral vascular spasm, and that in turn causes cerebral anoxia and predisposes to the formation of intravascular clots or thrombi.

Q. The spasm does.

A. Yes.

Q. Isn't it true that his condition started—and I'm talking about the symptoms of the stroke—while he was at home watching a football game?

A. I don't think so. I think the symptoms started when he heard over the radio that he had been sued for beating a child.

Q. Do you know when that was?

A. Early morning of December the 1st, 1988.

Q. And do you know when he heard these allegations that he had been sued?

A. I think that morning.

Q. Do you know when he read the articles?

A. I think that morning.

Q. 1988.

A. Uh-huh.

Q. And it's your opinion then that he started having the mini strokes, to use your term, at that time?

A. I think he started a gradual downhill course. I don't know when he started having the mini strokes. I think he started a gradual downhill course that continued to regress and regress and all these things eventually happened and finally the cerebral vascular actually killed him.

.        .        .        .        .

Q. Well, in layman's terms are you saying that because he worried about this lawsuit against him that he had a stroke?

A. Yes, sir, eventually.

The death certificate supports Dr. G.'s opinion. It shows the cause of death as follows: "immediate cause cardio respiratory arrest due to or as a consequence of large pulmonary embolus". Under "Other Significant Conditions" is written "recent stroke".

In *Decker*, supra, the claimant's heart attack was found to have resulted from mental stress caused by the work conditions, rather than the claimant's propensity to be a worrier. Thus, the Court found the requirement that the injury result from a risk reasonably incident to his employment was satisfied. In the instant case, as well, there was evidence that Employee did not

suffer from stress at work prior to the time the child abuse allegations and investigation into his disciplinary policies were begun. The fact that the school district's superintendent stated publicly that disciplinary action had been taken was upsetting to Employee because he thought it appeared Employer did not support him.

■ Whether an injury does arise out of and in the course of a claimant's employment is an issue of fact to be determined by the Workers' Compensation Court, and is not to be determined on review proceedings by the Supreme Court or the Court of Appeals where there is any competent evidence to support the order of the trial court. *Stiles v. Okla. Tax Commission,* supra, citing *Thomas v. Keith Hensel Optical Labs,* 653 P.2d 201 (Okl.1982); *Pearl v. Associated Milk Producers,* 581 P.2d 894 (Okl.1978). In the instant case, the medical evidence and lay testimony was disputed. There is competent evidence to support the trial court's order.

■ Employer contends that the medical report and deposition of Dr. G., Claimant's medical expert, is incompetent because it fails to consider the autopsy report and the medical reports and tests conducted at the hospital a few days before Employee's death. It also contends the report fails to conform to Rule 20 because it does not provide a complete history of Employee, or describe the medical treatment which had been rendered. The trial was bifurcated to, first, take non-medical testimony, and then submit this to medical experts on a medical hypothetical. The medical experts were to consider the transcript of the trial and the evidence admitted as exhibits, which were the death certificate and two newspaper articles about the lawsuit pending against Employee and Employer. As argued by Claimant's attorney, there is no evidence that Employee died of a cause other than a stroke; the issue is whether this injury arose out of and in the course of his employment with Employer.

An independent medical examiner was appointed, at Employer's request, on the issue of causation. When his report was submitted, it was apparent that his opinion was based upon medical information not admitted into evidence at the trial. The parties agreed that the report should not be considered, and the court noted in its order that no consideration was given to the report. Employer moved orally to appoint another independent physician, and the trial court denied the motion.

Dr. G., Claimant's medical expert, reviewed the evidence from the trial, including the death certificate, and determined that his death due to stroke arose out of and in the course of his employment. The trial court agreed with Dr. G., and this finding is supported by competent evidence. Further, our review of the medical report from Dr. F., Employer's medical expert, indicates that Dr. F. considered medical reports not admitted into evidence.

■ Employer argues the trial court's denial of its motion to appoint a second independent medical examiner was erroneous. It cites the case of *Kerr McGee Refinery Corporation v. Blackburn,* 805 P.2d 128 (Okl.App.1991), in which this Court held the court's failure to appoint an independent physician was error. However, the *Blackburn* case, supra, is distinguishable. It was not a death benefits case. The court in *Blackburn,* supra, failed to appoint an independent medical examiner when the request to do so was found to be timely by this Court. In the instant case, the trial court *did* appoint an independent physician at the request of Employer, but his report was found to be incompetent. Employer has not cited any authority for its proposition that the trial court was required to appoint another independent physician. Further, despite the urging by Employer that 85 O.S.1991 § 17 (identical to 85 O.S.Supp.1990 § 17) should apply to death cases as to the causation issue, the statutory language plainly provides that when the medical testimony to be presented by Employer and Employee disagrees "as to the medical cause of the *medical permanent impairment*" (emphasis added), the parties may follow the procedures for seeking the opinion of a third physician. It does not require the appointment of an independent medical examiner in a *death* claim. Death is not mentioned or contemplated in § 17, and it is applicable

only to living claimants with total or partial permanent disability. "Where, as here, a statutory right is created which did not exist at the common law and the same statute fixes the conditions upon which the right may be asserted, the conditions are an integral part of the right thus granted— are substantive conditions, the observance of which is essential to the assertion of the right." *Hughes Drilling Co. v. Morgan*, 648 P.2d 32, 35 (Okl.1982). The court's appointment of the independent physician was not required. Therefore, the appointment of another physician was not required. We find no error.

■■■■ Findings of fact made by the trial court are binding and conclusive in review proceedings before this Court, unless they lack support in competent evidence. *Parks v. Norman Municipal Hospital*, 684 P.2d 548 (Okl.1984). It is only when competent evidence is lacking that the trial court's decision may be determined to be erroneous as a matter of law. *Parks*, supra. Competent evidence supports the trial court's order. The order of the three judge panel affirming the trial court is SUSTAINED.

ADAMS, P.J., and JONES, J., concur.