## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2019-NMSC-022

Filing Date: November 18, 2019

No. S-1-SC-37077

**MICHAEL D. LEWIS, as Surviving
Spouse of PATRICIA A. LEWIS, deceased,**

Claimant-Petitioner/Cross-Respondent,

v.

**ALBUQUERQUE PUBLIC SCHOOLS,**

Employer-Respondent/Cross-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI
Leonard J. Padilla, Workers' Compensation Judge**

Released for Publication December 17, 2019.

Gerald A. Hanrahan
Albuquerque, NM

for Petitioner and Cross-Respondent

YLAW, P.C.
Michael D. Russell
Matthew L. Connelly
Albuquerque, NM

for Respondent and Cross-Petitioner

## OPINION

**VIGIL, Justice.**

**{1}**    This case involves death benefits under the Workers' Compensation Act (the Act), NMSA 1978, §§ 52-1-1 to -70 (1929, as amended through 2017). Following the death of Patricia Lewis (Worker), her widower Michael Lewis (Petitioner) was awarded death benefits under the Act. The Workers' Compensation Judge (WCJ) based the award on the finding that Worker, while employed with Albuquerque Public Schools

(Employer), contracted allergic bronchopulmonary aspergillosis (ABPA) which proximately resulted in Worker's death.

**{2}** Employer appealed the award to the Court of Appeals. *Lewis v. Albuquerque Public Schools*, 2018-NMCA-049, ¶ 1, 424 P.3d 643, *cert. granted* (S-1-SC-37077, Aug. 15, 2018). The Court of Appeals in pertinent part arrived at two conclusions. First, the Court held that the WCJ correctly rejected Employer's argument that Petitioner's claim for death benefits was time-barred. *Id.* ¶¶ 20, 29; *see* § 52-1-46 (stating that "if an accidental injury sustained by a worker proximately results in the worker's death within the period of two years following the worker's accidental injury, compensation shall be paid" subject to the statutory provisions). Second, the Court concluded that the WCJ erred in excluding from evidence certain medical testimony and records which Employer contended related to Worker's cause of death. *Lewis*, 2018-NMCA-049, ¶ 54. The Court reasoned that the limitation on expert testimony in workers' compensation cases contained in Section 52-1-51(C) does not apply to medical causation evidence in a death benefits case under the Act. *Lewis,* 2018-NMCA-049, ¶¶ 37, 54; *see* Section 52-1-51(C) (stating that "at any workers' compensation hearing concerning the particular injury in question," testimony may "[o]nly" be offered by a "health care provider who has treated the worker pursuant to [the Act] or a health care provider providing the independent medical examination [IME] pursuant to this section"). The Court of Appeals therefore remanded the case for retrial on whether Worker's ABPA "'proximately result[ed]'" in her death. *Lewis,* 2018-NMCA-049, ¶ 54 (alteration in original) (quoting § 52-1-46).

**{3}** We granted certiorari. On the first issue, we agree with the Court of Appeals that Petitioner's claim for death benefits was not time-barred, and we affirm. On the second issue concerning the WCJ's exclusion of medical testimony and evidence on Worker's cause of death, we hold that the Court of Appeals erred in its interpretation of Section 52-1-51(C), but we agree based on our own interpretation of Section 52-1-51(C) that the case must be remanded for further proceedings. In all other respects, we affirm the opinion of the Court of Appeals.

**{4}** This case involved two trials. The first was for compensation benefits for Worker, who died before the compensation order was filed. Employer did not appeal from the award of compensation benefits, and Petitioner filed the claim for death benefits after Worker died. In its answer to the death benefits claim, Employer admitted as binding all the findings of fact and conclusions of law entered in the previously tried compensation case. In addition, in the pretrial order for the death benefits trial the parties stipulated that the findings of fact and conclusions of law set forth in that compensation order were the "law of the case" in the death benefits trial.

## I.    BACKGROUND

### A.    Facts

**{5}** Worker was diagnosed with breast cancer in 1997. During the course of treatment for her breast cancer in 1997, a biopsy of Worker's lung tissue revealed the presence of aspergillus, but her physicians reported "no residual aspergillus" after the breast cancer treatment and after the cancer went into remission.

**{6}** Worker started working for Employer as a teacher at Manzano High School in 1999. At the beginning of the 2011-2012 school year, Worker was assigned to teach art classes in room J-13. Room J-13 had a history of roof leaks and a "clay trap" which, by appearances, was lined with mold. Worker, who suffered from asthma, began experiencing respiratory problems soon after she started teaching in room J-13 and notified her supervisors and appropriate personnel of the respiratory problems she was having from working in room J-13.

**{7}** Worker began treatment for her respiratory problems with Dr. John Liljestrand on October 3, 2011. Dr. Liljestrand was of the opinion that Worker's increased respiratory problems were related to her working in room J-13. Dr. Liljestrand wrote two letters to Employer, on December 8, 2011, and on January 10, 2012, informing Employer that Worker was suffering from severe asthma which was exacerbated by her exposure to dust and environmental allergens in her new classroom. Dr. Liljestrand was of the opinion that Worker was being subjected to a significant medical risk and recommended that she be permanently removed from her new classroom because the situation was becoming quite severe and potentially life threatening.

**{8}** Worker was exposed to aspergillus spores as a result of teaching in room J-13. On July 10 and July 16, 2012, Employer tested the air quality both inside and outside room J-13. Aspergillus is ubiquitous in the environment, particularly in soil. However, more aspergillus spores were collected inside room J-13 than outside room J-13. On July 10, seventy-eight percent of all collected spores (447 aspergillus spores) were found in the air inside room J-13, and on July 16, seventy-seven percent of all collected spores (453 aspergillus spores) were found in the air inside room J-13. Worker and her health care providers repeatedly requested professional cleaning of room J-13. The room was cleaned but by school janitors rather than a professional cleaning crew.

**{9}** Prior to Employer's testing of air quality, Dr. Liljestrand referred Worker to Dr. Steven Tolber, a board certified allergist and immunologist, for further treatment of her respiratory problems. Dr. Tolber's pulmonary function testing on April 26, 2012, revealed a "pulmonary obstruction" that required treating Worker with supplemental oxygen at the emergency room. Worker continued to require oxygen at four liters per minute for twenty-four hours per day until Worker died. On May 16, 2012, Dr. Tolber wrote a letter to Employer emphasizing "the severity of [Worker's] disease" and stating that Worker "may not return to working" in room J-13, that failing to remove her from room J-13 placed Worker "at risk of worsening lung function," and that failing to remove Worker from room J-13 "may put those responsible for keeping her in this room at legal risk for worsening her case."

**{10}** On October 22, 2012, Dr. Tolber diagnosed Worker with ABPA, caused by Worker's exposure to aspergillus mold in room J-13. Dr. Tolber believed that Worker's ABPA from 1997 had gone into remission but that exposure to aspergillus in room J-13 aggravated her condition and caused an ABPA relapse. Dr. Tolber referred Worker to Dr. Ronald Bronitsky, a pulmonologist, for evaluation. Dr. Bronitsky had no disagreements with the opinions of Dr. Tolber concerning Worker and gave his own opinion that it was very reasonable to conclude that aspergillus spores in room J-13 contributed to Worker's respiratory state. Dr. Tolber also referred Worker to the National Jewish Hospital in Denver, Colorado, where she received a level of care not available in New Mexico.

**{11}** In February 2012, while being treated for ABPA, Worker was diagnosed with breast cancer that had been in remission since 1997. Subsequently, Worker began chemotherapy with Dr. Richard Giudice, an oncologist at the New Mexico Cancer Center.

**{12}** Worker continued to work and earn her regular salary through December 21, 2012, when Dr. Tolber deemed Worker disabled and advised her not to return to work. Worker continued to receive her regular wage through available sick leave until March 31, 2013, when she retired.

## B.     The Compensation Case

**{13}** Worker filed a claim for workers' compensation disability benefits on March 6, 2013, alleging that her exposure to aspergillus mold in room J-13 resulted in her ABPA and ensuing disability. Worker's claim was tried over two days beginning on June 4, 2014. In the pretrial order the parties stipulated to the admission of the depositions of Dr. Liljestrand and Dr. Tolber. Dr. Giudice's deposition was also subsequently admitted into evidence without objection.

**{14}** On November 11, 2014, Worker saw Dr. Giudice to address a fever and breathing difficulties, although a chest x-ray taken that day did not reveal pneumonia. Worker had an appointment with Dr. Giudice the next day, but as she was leaving home that morning to go to the hospital, Worker collapsed and died. No autopsy was performed.

**{15}** The WCJ filed the compensation order on December 16, 2014, after Worker had died. The WCJ concluded as follows, in pertinent part. (1) "Worker suffered a compensable injury, diagnosed as ABPA, as a result of her exposure to aspergillus while working for Employer during the 2011-2012 school year." (2) "Worker's ABPA arose out of, was in the course of, and was reasonably incident to Worker's employment with Employer." (3) "The medical evidence establishes a causal connection between Worker's employment and her ABPA." (4) "Due to ABPA, Worker has been unable to perform the duties of a high school teacher." The WCJ also determined that Worker was entitled to temporary total disability (TTD) benefits compensation beginning on April 1, 2013, through January 15, 2014, and to permanent partial disability (PPD) benefits "for

700 weeks" beginning on January 16, 2014. Employer did not appeal from this compensation order.

## C.    The Death Benefits Case

**{16}**    Petitioner filed a claim for death benefits on January 22, 2015, alleging ABPA caused Worker's death. The death benefits claim went to trial on November 12, 2015. Prior to trial the depositions of Drs. Liljestrand, Tolber, and Giudice were taken again, this time on cause-of-death issues. The WCJ admitted the second depositions of Dr. Tolber and Dr. Liljestrand. However, the WCJ excluded Dr. Giudice's second deposition and medical records from the New Mexico Cancer Center, ruling that Section 52-1-51(C) barred admission of this evidence because Dr. Giudice was not a health care provider described in Section 52-1-51(C).

**{17}**    Worker's death certificate, completed by Dr. Liljestrand, was admitted into evidence. The death certificate listed Worker's cause of death as "pneumonia" and "chronic pneumonitis." Dr. Liljestrand testified that ABPA was either a direct or a contributing cause of Worker's pneumonia, resulting in chronic pneumonitis. Dr. Tolber in turn testified that Worker "most likely died of ABPA."

**{18}**    The WCJ issued a death benefits compensation order on April 21, 2016. The WCJ concluded as follows, in pertinent part. (1) "Worker suffered a compensable injury, diagnosed as ABPA, as a result of her exposure to aspergillus while working for Employer during the 2011-2012 school year." (2) "Worker's injury manifested itself on April 1, 2013." (3) "Worker's death on November 12, 2014, occurred within two years of April 1, 2013." (4) "Expert medical testimony establishes a causal connection between Worker's death and her A[BP]A." (5) "[Petitioner] is entitled to death benefits pursuant to [Section] 52-1-46."

## D.    The Court of Appeals Opinion

**{19}**    Employer appealed the death benefits compensation order to the Court of Appeals, arguing that the WCJ erred (1) in concluding that the death benefits claim was not time barred because Worker's death occurred within two years of her compensable injury and (2) in excluding Dr. Giudice's deposition and medical records from the New Mexico Cancer Center because this evidence supported its position that Worker died from cancer unrelated to ABPA. *Lewis*, 2018-NMCA-049, ¶ 1. In a formal opinion, the Court of Appeals held the following, among others. (1) "Worker knew or should have known she had a compensable injury on April 1, 2013, which is within two years of Worker's death on November 12, 2014." *Id.* ¶ 21. (2) "[T]he limitations period of Section 52-1-46 was not triggered until Worker knew or should have known she had an injury entitling her to . . . disability benefits." *Id.* ¶ 25. (3) "Section 52-1-51(C) does not limit expert testimony regarding the circumstances and cause of a worker's death in connection with a claim for death benefits . . . ." *Id.* ¶ 54. (4) The WCJ erred in its calculation of weekly death benefits. *Id.* ¶¶ 55-59.

**{20}** Both parties ask us to reverse the Court of Appeals. Employer asks us to reverse the holding that the claim for death benefits was timely, and Petitioner asks us to reverse the holding that the WCJ erred in excluding the testimony of Dr. Giudice and the medical records from the New Mexico Cancer Center. We granted both petitions.

## II.    DISCUSSION

### A.    Standard of Review

**{21}**    "In reviewing a WCJ's interpretation of statutory requirements, we apply a de novo standard of review." *Dewitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 14, 146 N.M. 453, 212 P.3d 341. "With respect to the admission or exclusion of evidence, we generally apply an abuse of discretion standard where the application of an evidentiary rule involves an exercise of discretion or judgment, but we apply a de novo standard to review any interpretations of law underlying the evidentiary ruling." *Id.* ¶ 13.

### B.    Timeliness of Petitioner's Claim

**{22}**    Section 52-1-46 provides in pertinent part that death benefits shall be paid "if an accidental injury sustained by a worker proximately results in the worker's death within the period of two years following the worker's accidental injury[.]" Employer argues that Worker's death on November 12, 2014, occurred more than two years after her work-related injury, which began shortly after her exposure to aspergillus mold in August 2011, and that as a result, Petitioner failed to file his claim for workers' compensation death benefits within the two-year time period prescribed by Section 52-1-46. Employer therefore contends that the Court of Appeals erred in affirming the order of the WCJ finding that the claim was timely. We disagree.

**{23}**    In *Torres v. Plastech Corp.*, 1997-NMSC-053, ¶ 11, 124 N.M. 197, 947 P.2d 154, we stated that the triggering event under Section 52-1-31(A), the statutory limitations period under which a worker must file a claim for workers' compensation, has two elements: "an injury entitling the worker to compensation under the Act" and "knowledge, or imputed knowledge, by the worker of this injury." Thus, the limitation period does not begin to run until the disability occurs and thereby entitles the worker to benefits under the Act, even if the worker is aware that an injury was suffered earlier. *Id.* Although *Torres* considered a different statute of limitations than the statute of limitations for death benefits under Section 52-1-46, the Court of Appeals in *Gambrel v. Marriott Hotel*, 1991-NMCA-100, ¶¶ 12-13, 112 N.M. 668, 818 P.2d 869, considered when an accidental injury occurs under Section 52-1-46 and concluded that the two-year limit for bringing a death benefits claim is triggered when the worker knows or should know that the worker has suffered an injury and when the worker's injury is compensable under the Act. We approve and follow *Gambrel* here.

**{24}**    The undisputed finding made by the WCJ in the compensation case, which Employer stipulated was binding in the death benefits case, is that Worker became entitled to TTD benefits on April 1, 2013, when her sick leave was exhausted.

Therefore, under *Torres* and *Gambrel*, the triggering date was April 1, 2013. Worker died on November 12, 2014, less than two years later. We hold that Petitioner's death benefits claim was timely under Section 52-1-46.

## C.      Expert Testimony in a Death Benefits Case

**{25}**    The WCJ relied solely on Section 52-1-51(C) as the basis for excluding Dr. Giudice's testimony and the New Mexico Cancer Center records. This statute directs, "Only a health care provider who has treated the worker pursuant to Section 52-1-49 NMSA 1978 or the health care provider providing the [IME] pursuant to this section may offer testimony at any workers' compensation hearing concerning the particular injury in question." The WCJ ruled that Worker's death "concern[s] the particular injury in question," and because Dr. Giudice was not a treating provider under the Act and had not performed an IME, his testimony was barred by Section 52-1-51(C).

**{26}**    On appeal, the Court of Appeals focused its inquiry on the meaning of the phrase "the hearing concerning the particular injury in question" in Section 52-1-51(C). *Lewis*, 2018-NMCA-049, ¶ 37. The Court of Appeals noted the distinction between treating a worker's injuries while the worker is alive and determining the cause of a worker's death after the worker has died. *See id.* ¶ 38. After analyzing Sections 52-1-49 and 52-1-51(C), *id.*, ¶¶ 38-48, the Court of Appeals concluded that "Section 52-1-49's and Section 52-1-51's provisions for selection of [health care providers] and IME examiners, respectively, are confined to the treatment and assessment of work-related injuries" and therefore that "it is absurd to identify them as the exclusive universe of witnesses who can testify about the cause or causes of a worker's death." *Id.* ¶ 49. The Court of Appeals held that Section 52-1-51(C) does not limit expert testimony to that given by a health care provider who has provided care for a worker's work-related injury pursuant to Section 52-1-49 or by an IME examiner identified pursuant to Section 52-1-51(A) in a contested claim for death benefits under Section 52-1-46. *Id.* ¶ 54.

**{27}**    Petitioner argues that the Court of Appeals should be reversed because failure to limit expert testimony on worker cause of death is "contrary to the plain meaning of Section 51-1-5(C)." Employer responds, "There is nothing in the statute, other relevant sections of the Act, or any other controlling authority that demonstrates an intent of the Legislature to subject the limitation set forth in Section 52-1-51(C) to a medical expert's cause of death determination under Sections 52-1-46 and -47." Echoing the reasoning of the Court of Appeals, Employer asserts that Section 52-1-51(C) applies only to "the particular injury in question" and not to "expert medical testimony concerning the cause of a worker's death" which, it contends, is an entirely different question.

**{28}**    We conclude that these arguments all find some support in the Act but that none adequately address how the Legislature intended for expert medical testimony to be obtained and presented in a contested death benefits case. To answer that question, we first examine the elements of a death benefits claim under the Act. We then demonstrate why Section 52-1-51 is ambiguous and, by construing that ambiguity,

answer how the Act provides for obtaining and presenting expert medical testimony in a contested death case.

## 1.     Elements of a death benefits claim

**{29}**     A death benefits claim arises under Section 52-1-46 which provides in pertinent part, "[I]f an accidental injury sustained by a worker proximately results in the worker's death within the period of two years following the worker's accidental injury, compensation" must be paid to "eligible dependents." A death benefits claim is "a separate cause of action, not derivative of the action worker could have maintained for compensation had he survived." *Gambrel*, 1991-NMCA-100, ¶¶ 7, 14 (citing A. Larson, 2A *The Law of Workmens' Compensation*, § 64.10-11). As such, a death benefits claim must satisfy the requirements set forth in Section 52-1-28(A). This statute provides that claims for workers' compensation "shall be allowed only: (1) when the worker has sustained an accidental injury arising out of and in the course of his employment; (2) when the accident was reasonably incident to his employment; and (3) when the disability is a natural and direct result of the accident."

**{30}**     In the December 16, 2014, compensation order awarding Worker TTD and PPD benefits, the WCJ concluded that "Worker suffered a compensable injury, diagnosed as ABPA, as a result of her exposure to aspergillus while working for Employer during the 2011-2012 school year" and "Worker's ABPA arose out of, was in the course of, and was reasonably incident to Worker's employment with Employer." Importantly, Employer did not appeal from this compensation order and, in the death benefits case, agreed that all findings of fact and conclusions of law in the compensation order were binding in the death benefits case. The quoted conclusions establish that Worker's "accidental injury" was the ABPA she contracted as a result of her exposure to aspergillus while working for Employer, thereby satisfying the first two elements of Section 52-1-28(A).

**{31}**     Section 52-1-28(A)(3) has two parts. That is, there must be proof of a "disability" which "is a natural and direct result of the accident." Turning first to the "disability" requirement, our case law establishes that the worker's death is analyzed as the "disability" in a death benefits case. *See Oliver v. City of Albuquerque*, 1987-NMSC-096, ¶ 4, 106 N.M. 350, 742 P.2d 1055. The *Oliver* trial court awarded death benefits when a firefighter died as a result of a heart attack at work. *Id.* ¶ 1. This Court held that Section 52-1-28(A) "requires that a worker's disability [death] be causally connected to the worker's injury [heart attack] and that the injury be causally connected to the worker's accident (the stress induced by [the worker's] job . . .)." *Oliver*, 1987-NMSC-096, ¶ 4; *see also Grine v. Peabody Nat. Res.*, 2006-NMSC-031, ¶¶ 1, 37, 140 N.M. 30, 139 P.3d 190 (remanding a death benefits appeal to the WCJ and requiring the petitioner to show employer knowledge of the worker's employment-related stress, the accident resulting in an on-the-job heart attack (injury) that caused the worker's death (disability)); *Herman v. Miners' Hospital*, 1991-NMSC-021, ¶ 15, 111 N.M. 550, 807 P.2d 734 ("In a workers' compensation case where a dependent seeks benefits based on the worker's death by heart attack, the death is analyzed as the disability, the heart attack as the injury, and the employment-related stress as the accident.").

**{32}** Turning next to causation, a claimant is required to prove that the worker's "disability is a natural and direct result of the accident." Section 52-1-28(A)(3). This requirement is contained in Section 52-1-46 which provides for death benefits "if an accidental injury sustained by a worker proximately results in the worker's death[.]" In this case, because Employer denied liability for Worker's death, Petitioner was required to prove by expert medical evidence a causal connection between Worker's ABPA (the "accidental injury") and her death (the "disability"). *See* § 52-1-28(B) ("In all cases where the employer or his insurance carrier deny that an alleged disability is a natural and direct result of the accident, the worker must establish that causal connection as a probability by expert testimony of a health care provider[.]"); *Grine*, 2006-NMSC-031, ¶¶ 19, 26 (requiring under Section 52-1-28(B) that when the employer has denied causation in a death benefits claim, a claimant must prove, by expert medical testimony, a causal connection between the employment and the worker's injury and death); *Herman*, 1991-NMSC-021, ¶ 7 (same); *Turner v. N.M. State Highway Dep't*, 1982-NMCA-097, ¶ 4, 98 N.M. 256, 648 P.2d 8 (requiring the same under the 1959 enactment of Section 52-1-28(B)).

**{33}** We now arrive at the dispute between the parties at trial and on appeal. Petitioner offered the testimony of Dr. Liljestrand and Dr. Tolber to establish the requisite causal connection between Worker's ABPA and death. Employer in turn offered the testimony of Dr. Giudice and associated medical records to support its contention that Worker died as a result of cancer unrelated to ABPA. That is to say, Employer offered this evidence to support its contention that there was no causal relationship between Worker's ABPA and her death. Petitioner objected, arguing that under the literal language of Section 52-1-51(C), the evidence was inadmissible. The WCJ agreed and excluded the evidence. The Court of Appeals reversed, holding that Section 52-1-51(C) does not bar the admission of expert medical testimony on the question of causation in a contested death benefits trial under the Act. *Lewis*, 2018-NMCA-049, ¶ 54. Finding no other bar to the admission of such evidence, the Court of Appeals remanded the case for a retrial on the causation issue after "consideration of all admitted evidence." *Id.* ¶¶ 54, 60.

**{34}** We agree with Petitioner that the result reached by the Court of Appeals supports "the unlimited right of all employers and/or insurers to go 'testimony-shopping' and to use any number of experts," and is therefore "contrary to the legislative intent to limit the use and number of experts." The result under the Court of Appeals opinion is that workers' compensation death cases must be investigated and tried in the same way as any other case in which the medical cause of death is at issue. The consequential expert witness fees, costs, and time required is not in keeping with the legislative intent for adjudicating workers' compensation cases. Moreover, claimants in death benefits cases are thereby forced to bear all the burdens present in a civil case to prove medical causation and, at the same time, are subject to all the restrictions of the Act, including the recovery available for death. As discussed below, we conclude that these consequences are all contrary to the purposes and public policy of the Act.

## 2.     Section 52-1-51 is ambiguous

**{35}** Section 52-1-51(C) states, "Only a health care provider who has treated the worker pursuant to Section 52-1-49 NMSA 1978 or the health care provider providing the [IME] pursuant to this section" may testify "at any workers' compensation hearing concerning the particular injury in question." Consistent with *Oliver*, *Grine*, and *Herman* and the undisputed findings of fact and conclusions of law in the compensation case, the "particular injury in question" was Worker's ABPA. Under Section 52-1-51(C), whether Worker's ABPA was causally related to Worker's death clearly related to and therefore "concern[ed]" Worker's ABPA.

**{36}** However, a cause of death determination is necessarily made after death occurs, and a health care provider who treated the worker pursuant to Section 52-1-49 treated the worker while the worker was alive. In addition, the designated medical issues for which a worker can be required to undergo an IME under Section 52-1-51(A)——"a dispute between the parties concerning the reasonableness or necessity of medical or surgical treatment, the date upon which maximum medical improvement was reached, the correct impairment rating for the worker, [or] the cause of an injury"——apply to a living worker. Additional sections pertaining to an IME also relate to a living person. *See* § 52-1-51(A) (stating that either party may petition "to have the worker undergo an [IME]"); § 52-1-51(E) (requiring the worker to travel to where the IME will be conducted and providing for the worker to be reimbursed for necessary and reasonable expenses); § 52-1-51(H) (providing for penalties if the worker fails or refuses to submit to the IME). For these reasons, the Court of Appeals concluded, "[IME] examiners can be appointed only to address concerns relating to the provision of medical care or disability benefits——that is, matters arising while the worker is alive." *Lewis*, 2018-NMCA-049, ¶ 44. We conclude that this is where the Court of Appeals erred.

**{37}** Section 52-1-51 is ambiguous and fails to provide answers to several questions. What happens, for example, if a health care provider who treated a worker pursuant to the Act has no opinion on whether there is a causal connection between the worker's injury and death? What if no autopsy was performed? It is impossible for us to conclude that the Legislature granted "eligible dependents" the right to pursue death benefits under the Act and at the same time prevented the "eligible dependents" from being able to present evidence in support of the claim. In addition, what happens if, as in this case, a health care provider was treating a worker at the time of the worker's death for an illness that may bear on causation, but the treatment was for an injury that was not pursuant to the Act? What happens if, as in this case, a health care provider has an opinion on causation, but the employer has other medical evidence to contest that opinion? What happens if the WCJ, as the fact finder, requires additional expert testimony to fully analyze the causation issue?

**{38}** In concluding that an IME under Section 52-1-51 refers only to "living workers," *Lewis*, 2018-NMCA-049, ¶ 44, followed the "plain meaning" rule. *See State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 2, 117 N.M. 346, 871 P.2d 1352 (summarizing the "plain meaning" rule: "State statutes are to be given effect as written and, where they are free from ambiguity, there is no room for construction; where the meaning of statutory language is plain, and words used by the legislature are free from ambiguity,

there is no basis for interpreting the statute." (internal quotation marks and citation omitted)). However, as discussed above, Section 52-1-51 is ambiguous, and a literal application of its terms leads to absurd results, contrary to the intent of the Legislature.

### 3.     Presenting expert testimony under Section 52-1-51

**{39}**     Our primary and fundamental duty in construing statutes is to give effect to legislative intent. *United States v. Reese*, 2014-NMSC-013, ¶ 19, 326 P.3d 454 ("Our guiding principle when we construe statutes is" to "determine and effectuate the Legislature's intent in enacting the statute."). In the performance of this duty, we have long held that "[c]ourts will not add words except where necessary to make the statute conform to the obvious intent of the legislature, or to prevent its being absurd." *State v. Nance*, 1966-NMSC-207, ¶ 16, 77 N.M. 39, 419 P.2d 242, *abrogated on other grounds*, *State v. Wilson*, 2011-NMSC-001, ¶¶ 14-16, 149 N.M. 273, 248 P.3d 315. "But where the language of the legislative act is doubtful or an adherence to the literal use of words would lead to injustice, absurdity or contradiction, the statute will be construed according to its obvious spirit or reason, even though this requires the rejection of words or the substitution of others." *Id.*; *see also, State ex rel. Brandenburg v. Sanchez*, 2014-NMSC-022, ¶ 4, 329 P.3d 654 ("We should not allow a literal plain reading of a statute to confound the legislative intent, and therefore, our inquiry does not end with the plain meaning of the words."); *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 11, 309 P.3d 1047 (stating that the plain language of a statute is the primary indicator of legislative intent but that if "'the plain meaning of the statute is doubtful, ambiguous, or . . . an adherence to the literal use of the words would lead to injustice, absurdity or contradiction, we will construe the statute according to its obvious spirit or reason'" (citation omitted)); *Cummings v. X-Ray Assocs. of N.M.*, 1996-NMSC-035, ¶ 45, 121 N.M. 821, 918 P.2d 1321 ("We will not rest our conclusions upon the plain meaning of the language [in a statute] if the intention of the legislature suggests a meaning different from that suggested by the literal language[.]").

**{40}**     As in *Grine*, 2006-NMSC-031, ¶ 19, "We believe the record in this case illustrates a circumstance the Legislature did not foresee." There is no express provision in the Act specifically addressing expert medical causation testimony in a contested death benefits case. For guidance on how the Act provides an answer, we look to the legislatively expressed purposes and policies of the Act and to the existing statutes. Section 52-5-1 states that the purpose of the Act is "to provide a workers' benefit system . . . to assure the quick and efficient delivery of indemnity and medical benefits to injured and disabled workers at a reasonable cost to the employers who are subject to [the Act]" NMSA 1978, § 52-5-1(1990). In other words, the purpose of the Act "is to provide an humanitarian and economical system of compensation to the injured workman." *Casillas v. S.W.I.G.*, 1981-NMCA-045, ¶ 9, 96 N.M. 84, 628 P.2d 329. "The economic purpose is to keep an injured workman and his family at least minimally secure financially." *Id.* ¶ 10. "The Act may be seen as a social contract between employer and employee in which the former agrees to pay under a no-fault system and the latter agrees to pursue only those benefits provided for under the Act." *Archer v. Roadrunner Trucking, Inc.*, 1997-NMSC-003, ¶ 7, 122 N.M. 703, 930 P.2d 1155. Under the Act, "[t]he injured

worker receives compensation quickly, without having to endure the rigors of litigation or prove fault on behalf of the employer." *Salazar v. Torres*, 2005-NMCA-127, ¶ 5, 138 N.M. 510, 122 P.3d 1279, *rev'd on other grounds sub nom.*, 2007-NMSC-019, ¶ 1, 141 N.M. 559, 158 P.3d 449. In keeping with these principles, this Court has previously declared, "We are sensitive to the obvious intent of the Legislature to avoid testimony-shopping and 'to limit the use and number of experts in workers' compensation cases.'" *Dewitt*, 2009-NMSC-032, ¶ 35 (citation omitted).

**{41}**   We conclude, in the context of the legislatively expressed public policy and purposes of the Act, that existing statutes provide an answer to the questions raised here. Section 52-1-51(A) states in pertinent part, "In the event of a dispute between the parties concerning [medical care or disability] or *any other medical issue*, if the parties cannot agree upon the use of a specific [IME] examiner, either party may petition a [WCJ] for permission to have the worker undergo an [IME]." (Emphasis added.) The statute continues, "If a [WCJ] believes that an [IME] will assist the judge with the proper determination of *any issue in the case*, including the cause of the injury, the [WCJ] may order an [IME] upon the judge's own motion." (Emphasis added.) In the context of a contested death benefits case, an issue concerning "disability" (i.e., death) or its cause is, without question, a "medical issue" and an "issue in the case."

**{42}**   Thus, while Section 52-1-51(A) might, as interpreted by the Court of Appeals, be construed as applying only to living persons, the statutory terms "any other medical issue" and "any issue in the case" are broad enough to encompass the medical cause of death of a worker. We therefore construe Section 52-1-51(A) to mean that in a contested death benefits workers' compensation case, the parties can agree upon an IME examiner to perform an IME, and the WCJ has authority to order an IME on the motion of a party or on its own motion. "The IME shall be performed immediately," § 52-1-51(A), and the employer must pay for the IME, § 52-1-51(B). The purpose of such an IME is to determine the causal connection, if any, between the worker's injury and the worker's death.

**{43}**   While New Mexico case law provides no specific guidance on whether an IME may be conducted after death, an IME is recognized as a means for determining cause-of-death issues. *See Turner v. Workmen's Comp. Appeals Bd.*, 42 Cal. App.3d 1036, 1039 (Ct. App. 1974) (ordering an IME in response to a party's moving the appeals board to reconsider the decision in the trial of a death benefits case where the referee heard conflicting reports on the worker's cause of death); *Bingham v. Workmen's Comp. Appeals Bd.*, 261 Cal. App.2d 842, 845-46 (Ct. App. 1968) (same); *In re Capalbo v. Stone & Webster Const. Servs.*, 91 A.D.3d 1263, 1263 (N.Y. App. Div. 2012) (allowing the employer to submit an IME report contesting causation after the workers' compensation law judge found prima facie evidence that the worker's death was compensable); *but see Ponca City Pub. Sch. v. Ritcheson*, 853 P.2d 782, 786-87 (Okla. Civ. App. 1993) (holding that the trial court's appointment of an IME examiner at the employer's request to determine causation in a death benefits case "was not required").

**{44}** Because the worker in a death benefits case is deceased, the expert's IME necessarily consists of an examination of pertinent medical records and other relevant data in determining the causal relationship if any between the worker's injury and the worker's death. The testimony of the independent medical examiner who is agreed upon by the parties or appointed by the WCJ is therefore admissible under Section 52-1-51(C).

**{45}** We hold that the legal basis on which the Court of Appeals relied to reverse the order of the WCJ was faulty and that the WCJ likewise erred in its interpretation of Section 52-1-51.

### III.    CONCLUSION

**{46}** We affirm in part and reverse in part the opinion of the Court of Appeals, and we remand the case to the WCJ for further proceedings in accordance with this opinion.

**{47}   IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

**JUDITH K. NAKAMURA, Chief Justice**

**BARBARA J VIGIL, Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**